UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CONNECTION MODEL LLC

Plaintiff,

v.

HUBSPOT, INC.

Defendant

Civil Action No.: _____

**Jury Trial Requested**

## COMPLAINT

Plaintiff Connection Model LLC ("Connection" or "Plaintiff"), files this Complaint for damages against HubSpot, Inc. ("HubSpot" or "Defendant"), alleging the following:

## NATURE OF THE CASE

1. This is a civil action seeking damages arising from HubSpot's intentional and wrongful efforts to avoid paying revenue share commissions on lucrative business obtained through Connection's efforts.

2. HubSpot agreed to share revenue to Connection[1] pursuant to a HubSpot Solutions Partner Program Agreement (hereinafter, the "Agreement") that appointed Connection as HubSpot's sales partner for the sale of HubSpot's products and services.

3. Pursuant to the Agreement, Connection delivered online marketing service packages (the "Packages") as a Value-Added Reseller ("VAR") of HubSpot, presenting HubSpot software as part of its solution set.

---

[1] Plaintiff brings this action on its own behalf but expressly reserves the right to amend this Complaint as a matter of course or with leave of court, including (without limitation) to seek certification of a plaintiff class pursuant to applicable law, as further facts are ascertained demonstrating a uniform practice by HubSpot.

4.    In exchange for providing these Packages, and helping HubSpot resell and retain customers, for each new customer subscribed to HubSpot, Connection as a VAR received lifetime commissions.

5.    With many platforms to choose from, this lifetime feature was significant, material and essential, as HubSpot was a company looking for rapid growth for paid users of its full marketing suite and ecosystem, without the traditional drawbacks of high turn-over it had been experiencing, and enticing partners including Connection to take the time and investment to obtain and integrate new customers into HubSpot's ecosystem was a critical link to its long-term growth and success, particular its focus on platform expansion in the 2010s.

6.    In reliance on these terms, Connection did just as HubSpot's commission structure and lifetime duration was intended to induce its partners to do: signed up new, long-term customers onto HubSpot's software and sold approximately 26 Packages.

7.    But even though HubSpot promised that it would compensate Connection for its efforts, and Connection relied on that lifetime commission promise, HubSpot later – under the direction of new management – reneged on that promise to move revenues off its partner's column and into its own revenue column.

8.    Even though HubSpot secured lucrative business with customers, HubSpot refused to pay the revenue share commissions owed, with lifetime commissions eliminated from the August 2025 commission payments onward and a reduction of upwards of an estimated 90% of Connection's commissions.  It did so notwithstanding its acknowledgment that when a partner secures a customer for HubSpot, the retention rates increase dramatically up to over 90% long-term retention (96% in the case of Connection).

9. Thus, in breach of its contractual obligations, HubSpot has willfully failed to pay commissions due under its Agreement with Connection.

10. As a result, Plaintiff seeks an award of monetary damages, multiple damages, attorneys' fees, and reasonable costs.

## THE PARTIES

11. Plaintiff Connection is a Washington limited liability company, with its principal place of business located at 1935 265th Avenue Se, Sammamish, WA, 98075. Plaintiff is, and at all relevant times was, a "Partner" and/or "Provider" participating in HubSpot's Solutions Partner Program and VAR Tier Program.

12. On information and belief, Defendant HubSpot is a foreign corporation organized under the laws of Delaware, with its principal place of business located at 2 Canal Park, Cambridge, MA 02141.

## JURISDICTION

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between Plaintiff and Defendant and the amount in controversy is greater than $75,000, exclusive of interest and costs.

14. Plaintiff is a citizen of the State of Washington.

15. Defendant is a corporation registered to do business in the Commonwealth of Massachusetts. The President and Director is Yamini Rangan.

16. According to its corporate filings, HubSpot's registered agent in Massachusetts is CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

17. Upon information and belief, HubSpot global headquarters is located at 2 Canal Park, Cambridge, Massachusetts.

18. The exercise of personal jurisdiction over HubSpot is appropriate based on the contractual agreement in Section 16(b) of the Agreement between Connection and HubSpot, traditional jurisdictional principles (i.e. specific and/or general jurisdiction), agency, and/or alter ego jurisdiction.

19. Venue is proper in the District of Massachusetts pursuant to the forum selection clause in Section 16(b) of the Agreement between Connection and HubSpot.

## FACTUAL BACKGROUND

### A. Connection's Business Model

20. Connection has at least 17 years of experience in assisting small, medium, and large companies with outsourcing their digital marketing operations. It focuses on helping clients grow revenue, generate qualified leads, and acquire profitable new customers through measurable, accountable inbound marketing.

21. Connection's experience includes assisting medical, pharmaceutical, manufacturing, professional services, and software companies and with advice and guidance related to digital marketing agency.

22. Connection enters partnership agreements with vendors like HubSpot. The agreements provide that if the vendor contracts with companies (known as "End Users") to provide digital marketing services, the vendor pays Connection a commission on revenue received from the End User as it is earned, on a regular basis (quarterly in the case of HubSpot). These contracts between vendor and End User are often long-term deals, running one to three years or even longer, and are often renewed for additional terms, usually two to three years at a time, as was HubSpot's expectation and stated goal. The long term retention rates confirm this.

23.    Connection performs significant preparation work with the End Users before any agreement is signed between vendor and End User. Connection holds discovery calls where prospective End Users explain their pains and needs as they relate to online, lead generation, and marketing. Connection then recommends a solution, which often involves HubSpot as a core component of the solution. Connection arranges and holds the software demonstration and conducts all proposal writing and follow up to get the End User to the point of signing with both HubSpot (for software) and Connection Model (for services).. In many cases, Connection's preliminary interactions with the End User stretch out over the course of 18 months or more, with extensive efforts being made by multiple Connection personnel involved in the process.

24.    Connection's livelihood depends on its vendors, like HubSpot, honoring their contracts with Connection. Connection incurs significant risk in these arrangements because if the vendor is not selected by the End User, the vendor owes Connection nothing.  Connection makes that investment in one vendor instead of the other alternatives in light of the vendor's relative capabilities, platform and compensation structure. When the deal is consummated between vendor and End User, vendor pays a percentage of revenue to Connection upon receipt of that revenue from the End User. A vendor who collects the revenue but does not pay the commission is unjustly enriching itself at Connection's expense.

**B. The Agreement and VAR Tier Program**

25.    HubSpot and Connection entered into the Agreement on or about 2012, which HubSpot describes as "a contract between you (the Partner or Provider, together addressed as Participant(s)) and us (HubSpot)." Under the Agreement, Connection is referred to as a "Partner" and/or "Provider."

26.     The Agreement grants Connection a non-exclusive, non-transferable right to, among other things, demonstrate and promote HubSpot products and provide End Users access to use certain HubSpot subscription services.

27.     Connection also participated in HubSpot's VAR Tier Program, as described in HubSpot's VAR Tier Program Brochure (the "Brochure"). The Brochure sets out requirements, benefits, and tier structures (including Silver, Gold, and Platinum tiers) for VARs.

28.     The Agreement and the Brochure, together with incorporated program policies, govern the parties' rights and obligations, including revenue share payments, tier eligibility, and program benefits.

## C.  Plaintiff's Eligibility and Performance

29.     Under the Agreement, Partner eligibility requirements include, among other things, maintaining an active subscription to specified HubSpot products, completing partner onboarding, and satisfying training and certification requirements at the time of new customer sign-up.

30.     Under the Brochure, the VAR Tier Program establishes baseline requirements and tier-specific metrics, including minimum monthly recurring revenue ("MRR") thresholds and customer performance metrics (e.g., average customer age or CHI scores), for Silver, Gold, and Platinum tiers.

31.     At all relevant times, Connection met and/or exceeded any Partner or Provider Eligibility Requirements and the Brochure's VAR Tier baseline and tier requirements of the Agreement.

32.     Plaintiff maintained an active Enterprise HubSpot subscription and completed HubSpot onboarding and required training/certifications; achieved the required MRR and customer performance metrics to hold at least the Gold or Platinum tiers; registered prospects and

6

customers through HubSpot's partner tools as required; and moreover, complied even with applicable program policies, privacy and marketing laws, and HubSpot's trademark and promotion guidelines.

33.    Connection devoted substantial time and resources to promoting and selling HubSpot subscription services, registering prospects, and supporting End Users, all in reliance on HubSpot's promises of ongoing revenue share and tier benefits.

**D. HubSpot's Revenue Share Obligations**

34.    The Agreement obligates HubSpot to pay Connection a revenue share on "Qualified Transactions."

35.    The Agreement defines "Partner Revenue Share" as "an amount equal to twenty percent (20%) of Net Revenue," and "Provider Revenue Share" as 20% of Net Revenue for the first twelve (12) months of an applicable End User's subscription service.

36.    The Agreement defines "Net Revenue" to include fees actually paid by End Users for the HubSpot subscription service, including the initial fee, any renewal fees, and any upgrade or downgrade fees (net of discounts, taxes, refunds, and certain exclusions).

37.    The Agreement requires HubSpot to pay revenue share to Connection within forty-five (45) days after the end of each fiscal quarter based on Net Revenue recognized from Qualified Transactions in that quarter.

38.    HubSpot's own Brochure emphasizes that VARs will receive a 20% revenue share and describes that this revenue share is earned in connection with the VAR's efforts to resell and retain customers.    And then-President and Founder Brian Halligan in an all-partners live presentation prominently highlighted that they would be receiving 20% revenue share for the life of the customer.

39.    Connection duly registered prospects, assisted in sales, and generated numerous Qualified Transactions, resulting in substantial Net Revenue for HubSpot.

40.    Connection provided HubSpot with the required tax and banking information and maintained eligibility to receive revenue share payments.

41.    Notwithstanding Connection's performance and HubSpot's obligations under the Agreement, beginning August 2025, HubSpot failed to pay Connection the full 20% Revenue Share owed on multiple Qualified Transactions, failed to pay revenue share in the time required, and/or ceased paying revenue share altogether with respect to certain End Users originated or supported by Connection.  The result was an approximate 90% reduction in quarterly commissions that HubSpot paid to Connection.

42.    Connection notified HubSpot via email, Slack, and Partner meetings of these underpayments and non-payments and requested that HubSpot correct its payment practices and remit all revenue share owed. HubSpot refused and/or failed to cure its breaches.

E.    HubSpot Solutions Partner Program Tiers and Benefits Guide

43.    The HubSpot "Solutions Partner Program Tiers & Benefits Guide" (the "Tiers & Benefits Guide") sets out detailed, tier-specific requirements and benefits for Solutions Providers and Solutions Partners, including Gold, Platinum, Diamond, and Elite tiers. The Tiers & Benefits Guide is part of the Program Policies that the Agreement incorporates by reference and is expressly presented by HubSpot as the operative description of the duration of tiers and benefits available to participants in the Solutions Partner Program.

44.    The Tiers & Benefits Guide explains that to qualify for and maintain each tier, a partner must: (a) self-purchase and maintain an active subscription to at least a specified HubSpot "Professional" product; (b) complete Partner Onboarding and Partner Certification; and (c) meet

8

objective performance thresholds for "Sold MRR" and "Managed MRR" over a trailing twelve-month period, as well as minimum product usage metrics. For example, the Guide specifies that a Gold Solutions Partner must maintain at least $3,000 in Sold MRR and $3,000 in Managed MRR (or adjusted thresholds in certain "growth markets") and a minimum median product app usage of three (3) or more product apps among sold customers; Platinum, Diamond, and Elite tiers are similarly defined by higher Sold MRR and Managed MRR thresholds and the same usage metric. Basically, the requirements are intended to be minimum, met so long as Connection does not voluntarily cease meaningfully participating in HubSpot's solutions ecosystem.

45. The Tiers & Benefits Guide further distinguishes between a "Solutions Provider" and a "Solutions Partner." A Solutions Provider must self-purchase "Any Starter Product" and has no Sold MRR or Managed MRR requirement, whereas a Solutions Partner must self-purchase "Any Professional Product," complete Partner Onboarding and Partner Certification, and thereafter becomes eligible to achieve Gold, Platinum, Diamond, and Elite tier status based on performance.

46. The Tiers & Benefits Guide also sets out specific financial benefits by tier. It states that Solutions Providers receive "20% for the first 12 months" of customer subscription revenue, while Solutions Partners and all tiered partners (Gold, Platinum, Diamond, and Elite) are entitled to "20% for **Lifetime** of Customer Subscription." (emphasis supplied). This confirms that, once a participant qualifies as a Solutions Partner and achieves a tier level, HubSpot will pay 20% revenue share on Net Revenue for the lifetime of the End User's Subscription Service, subject only to the Agreement's expressed limitations and forfeiture provisions.

47. This "Lifetime" 20% revenue share feature of Solutions Partners was heavily promoted to Connection and its peer group, as a standout feature that would induce the time,

energy, and commitment needed in the industry for HubSpot to achieve massive growth. This positioned HubSpot to massively grow its customer base, while at the same time massively expand its services offerings to expand services and increase revenues (most readily provided to customers already a part of the ecosystem thanks to Connection and its peers). For example, from 2010 to 2014 (when HubSpot had its IPO that October), HubSpot's annual revenues jumped from approximately $15 million to over $115 million, and over the next four years its revenues nearly doubled every other year up to over $513 million by 2018.

48.    Beyond financial terms, the Tiers & Benefits Guide defines tier-specific operational and marketing benefits incurring to its Providers and Partners, including: (a) increased "Domain Registration Capacity" (50 for Providers and base Partners, 250 for Gold partners, 400 for Platinum partners, 800 for Diamond partners, and 1,000 for Elite partners); (b) access to dedicated people resources such as a Channel Account Manager, Channel Consultant, Priority Partner Support, and, at higher tiers, a Solutions Architect and Annual Executive Onsite; (c) marketing and promotional benefits such as a listing in the HubSpot Solutions Directory, the right to use a tier badge, eligibility to write for HubSpot's user and marketing blogs, and other co-marketing opportunities; and (d) community and event benefits such as discounted or complimentary INBOUND conference tickets, invitations to local and regional Partner Day events, and, for Diamond and Elite partners, automatic invitations to advisory councils and exclusive events.

49.    At all relevant times, Connection satisfied the Solutions Partner and tier requirements set forth in the Tiers & Benefits Guide and all materials therein. Connection maintained an active subscription to at least an Enterprise level HubSpot product, completed required Partner Onboarding and Partner Certification, and consistently met or exceeded the Sold MRR, Managed MRR, and median product app usage thresholds necessary to hold at least the

Gold or Platinum Solutions Partner tier at all relevant times. Plaintiff's performance metrics and HubSpot's own reporting confirmed that Plaintiff qualified for, and maintained, that tier status.

50.     For each new customer secured to HubSpot by Connection, the requirements were met, and Connection became contractually entitled, under the Agreement and incorporated Program Policies, including but not limited, to: (a) 20% revenue share for the lifetime of each qualified customer's subscriptions; (b) a higher Domain Registration Capacity commensurate with Connection's tier; (c) dedicated access to a Channel Account Manager and Channel Consultant and, at Plaintiff's tier level, other people-support resources promised by HubSpot; and (d) tier-specific marketing, sales, and community benefits, including directory listings, tier badges, INBOUND ticket allocations, and invitations to Partner Day and advisory forums.

51.     Notwithstanding Connection's compliance with the Tiers & Benefits Guide and the Agreement, HubSpot denied Connection the tier-specific benefits promised in the Tiers & Benefits Guide. More specifically, and without limit, since August 2025 HubSpot refused or failed to pay lifetime 20% revenue share on End Users originated or managed by Plaintiff, instead capping commissions at twelve (12) months or eliminating them altogether.

52.     HubSpot's failure to confer and maintain these tier-specific benefits, despite Connection's satisfaction of the Agreement's terms, including as further memorialized in the Tiers & Benefits Guide's objective thresholds, was contrary to the express structure of the Solutions Partner Program as defined in the Tiers & Benefits Guide and the Agreement, and deprived Connection of the very benefits for which it invested substantial time, resources, and marketing efforts.

**F. HubSpot's Stripping of Benefits**

53.    Despite Connection having executed all material obligations to entitle it to lifetime revenue share, on or prior to August 2025, HubSpot announced its was scrapping the contractual lifetime obligation and not paying unless Partners met a new "Legacy Commission Plan" or "Legacy Commission Policy" for Solutions Partners (the "Legacy Commission Plan"), purportedly incorporated into the HubSpot Solutions Partner Program Policies.

54.    Instead of HubSpot's contractual obligations, for commission payments paid beginning August 2025, HubSpot refused to pay: "Solutions Partners must continue to actively manage the Customer, as demonstrated by Managed MRR credit (in line with the Legacy Commission Policy)."

55.    On information and belief, HubSpot also announced that, for commissions on new deals closed on or after April 1, 2023, Solutions Partners on such new deals would no longer be paid on a lifetime basis but would instead be limited to a fixed term (e.g., three (3) years), while "legacy" deals closed before April 1, 2023 would not be paid lifetime commissions unless the Solutions Partner also continued to meet the brand new unilaterally-announced Legacy Commission Plan's active-management requirements.

56.    HubSpot wrongfully claimed it could recapture lifetime revenue shares for itself, despite having already foregone those lifetime revenues, an opportunity already foregone on contracting including as determined by the reasonable expectations of Connection Model and the other Solutions Partners.[2]

---

[2] HubSpot's attempt to unilaterally "recapture opportunities foregone on contracting as determined by the other party's reasonable expectations" is a clear violation of both Massachusetts contract law and Section 93A law. *See, e.g. Anthony's Pier Four, Inc. v. HBC Associates*, 583 N.E.2d 806, 821 (Mass. 1991), *citing* E.A. Farnsworth, Contracts § 7.17 (a), at 329 (1990), *quoting* Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv.L.Rev. 369, 369, 372–373 (1980).

57.     While the full performance of each Partner including Connection had already succeeded in bringing HubSpot new customers with dramatically higher retention rates and growth opportunities, bringing it from a $15 million per year revenue company to over $1 billion per year by 2020, and HubSpot now enjoys the lifetime substantial higher revenue of each of these customers (many in the ecosystem now for over a decade), HubSpot now seeks to unilaterally refuse its agreed 20% lifetime commissions for those customers.

58.     Connection joined HubSpot's Solutions Partner Program over a decade before February 21, 2023, and originated and closed a massive number of Qualified Transactions before April 1, 2023. Plaintiff also continued to "actively manage" those customers within the meaning of even the unilaterally announced Legacy Commission Plan and Program Policies, as demonstrated by ongoing Managed MRR credit and ongoing service, consulting, and account-management activities for those customers.

59.     Notwithstanding Connection's compliance with the Legacy Commission Plan, HubSpot unilaterally curtailed and/or stopped revenue share payments on multiple pre-April 1, 2023, Qualified Transactions beginning with the August 2025 quarterly commission payments, ceasing to pay approximately 90% of Connection's required quarterly commissions because HubSpot contended that Connection was no longer "actively managing" certain accounts.

60.     HubSpot's conduct constitutes a material breach of the Agreement, the Brochure, and the implied covenant of good faith and fair dealing.

## COUNT I
### BREACH OF CONTRACT

61.     Plaintiff incorporates by reference each paragraph of this Complaint as if fully set forth herein.

13

62. Plaintiff and Defendant have a valid contract, which requires Defendant to pay commissions to Plaintiff on revenue received from the End Users' Packages.

63. Plaintiff complied with its obligations under the Agreement, and is not in breach of the Agreement, or otherwise excused for any alleged breaches.

64. HubSpot owes "20% for Lifetime of Customer Subscription" on all revenues HubSpot receives for HubSpot customers secured by Connection (secured prior to April 1, 2023) on a quarterly basis.

65. Beginning in August 2025, HubSpot failed to pay said 20% revenue share for those HubSpot customers it claimed are no longer actively managed by Connection.

66. The result was a material and overwhelming approximately 90% reduction in quarterly commission payments, which will amount over the remaining lifetime of these customers to an estimated millions of dollars in failures to pay.

67. Plaintiff advised Defendants verbally and in writing of their continuing obligations under the Agreement, but Defendants have refused to pay commissions due thereunder.

68. HubSpot's breach of the Agreement has caused Plaintiff to suffer substantial loss and harm. This harm is ongoing and will continue into the future indefinitely for as long as HubSpot continues to provide digital marketing management and operations services to the End Users.

69. Plaintiff is entitled to recover from HubSpot unpaid commissions and the contractual interest thereon, attorneys' fees, pre- and post-judgment interest, and any other costs and relief that this Court deems just and proper.

70.     Plaintiff is also entitled to interim and permanent injunctive relief requiring HubSpot to comply with the Agreement, including payment to Connection of 20% revenue share for the lifetime of every HubSpot customer Connection secured prior to April 1, 2023.

<strong><u>COUNT II</u></strong><br><strong>BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING</strong>

71.     Plaintiff incorporates by reference each paragraph of this Complaint as if fully set forth herein.

72.     The Agreement includes an implied covenant of good faith and fair dealing.

73.     Pursuant to the Agreement, Connection is entitled to earn 20% revenue share commissions based on revenue HubSpot receives from End Users throughout the term of HubSpot's agreements with End Users, for the entire lifetime of that term.

74.     Implied in the Agreement between Connection and HubSpot was a covenant that HubSpot would do nothing to circumvent Connection and thwart its ability to realize the fruits of the parties' contract.

75.     In 2025, HubSpot violated this covenant by employing any alleged contractual discretion (that HubSpot believed it had) in bad faith to curtail Plaintiff's ability to earn commissions and derive the benefit of the Agreement. HubSpot's implementation and application of the purported 2023 Legacy Commission Plan and unilateral determination that it would no longer pay lifetime commissions —or *any* revenue share commissions—absent active account management also violated the implied covenant of good faith and fair dealing.

76.     Rather than honoring the Agreement by continuing revenue share on pre-April 1, 2023 customers secured by Connection, HubSpot used the announcement of new go-forward terms on new customers as pretext to curtail or terminate Plaintiff's legacy commissions on legacy customers, unilaterally retroactively applied more restrictive terms to Plaintiff's existing book of

business, and thereby deprived Plaintiff of the core economic benefit of the Agreement and the Solutions Partner Program.

77.     Nor was Connection given any choice in the matter, or any feasible way to avoid HubSpot's unilateral decision to in bad faith cease lifetime payments.  Lifetime growth of legacy customers was the benefit HubSpot was after inducing Connection's action and agreeing to lifetime revenue share.

78.     HubSpot's unilateral demand for additional performance in the form of active account management (a decision of customers not even within Connection's control) was an attempt after the fact to completely restructure the nature of the agreement and consideration required of Connection.  Nor did the Agreement permit HubSpot to so fundamentally restructure the benefit of the bargain between its Partners (including Connection) and HubSpot.

79.     Even worse, because of the lifetime revenue share policy, HubSpot induced Connection and Connection complied with training and providing these legacy customers with the tools to self-manage or find alternatives, "institutionalizing" the legacy customers – an institutionalization that HubSpot actively encouraged and incentivized by *not* including an active management requirement in its lifetime revenue share agreement.

80.     Defendant is liable to Plaintiff for breaching its duty of good faith and fair dealing, in an amount to be determined at trial.

81.     Plaintiff is entitled to interim and permanent injunctive relief requiring HubSpot to continue paying the 20% lifetime revenue sharing to Connection on legacy customers secured by Connection prior to April 1, 2023 and prohibiting its cessation.

### COUNT III
### UNFAIR AND DECEPTIVE ACTS AND PRACTICES IN TRADE OR COMMERCE
### (MASS. GEN. LAWS c. 93A, § 11, OR OTHER APPLICABLE STATE LAW)

82.     Plaintiff incorporates by reference each paragraph of this Complaint as if fully set forth herein.

83.     At all relevant times, Plaintiff and Defendant were engaged in trade or commerce within the meaning of Mass. Gen. Laws ch. 93A, § 11, and/or within the meaning of any other applicable state unfair trade practice or consumer protection statute that governs this dispute (the "Unfair Trade Practices Statute").

84.     The parties' relationship arises from and is governed in part by the HubSpot Solutions Partner Program Agreement and related Program Policies, which specify that the Agreement is governed by the law of the Commonwealth of Massachusetts and that any disputes shall be brought in courts located in Boston, Massachusetts. To the extent enforceable, that choice-of-law provision makes Mass. Gen. Laws ch. 93A, § 11 applicable to this dispute.

85.     In the alternative, and only if the Court determines that another state's law governs some or all of the claims in this action, HubSpot's conduct as alleged herein likewise violates that state's unfair and deceptive trade practices statute to the extent such statute applies.

86.     HubSpot, through its Solutions Partner Program Agreement, Solutions Partner Program Tiers & Benefits Guide, Legacy Commission Plan, and related Program Policies and communications, engaged in unfair and deceptive acts and practices, including but not limited to:

(a)     Publicly promoting clear commission, tier, and benefits structures—such as a 20% "lifetime" revenue share—to induce Plaintiff to join, remain in, and heavily invest in the Solutions Partner Program;

(b)     Failing to provide clear, timely, and non-misleading notice of material changes to those commission structures and benefits, and failing to disclose the full economic impact of those changes on Plaintiff's existing and future commissions;

17

(c) Retroactively purporting to apply new, less favorable commission rules and/or duration limits to Plaintiff's existing book of business that fundamentally altered the benefit of the bargain, including legacy accounts that HubSpot had represented would remain eligible for continued or lifetime commissions, providing HubSpot massive growth for more than a decade; and

(d) Interpreting and enforcing Program Policies, including the Legacy Commission Plan, in an inconsistent, one-sided, and pretextual manner designed primarily to unilaterally and fundamentally alter the benefit of the bargain and reduce HubSpot's obligations while retaining the benefits of Plaintiff's sales, marketing, and customer-management efforts.

87. HubSpot further acted unfairly and deceptively by:

(a) Encouraging Plaintiff to build and orient its business model, staffing, service offerings, and marketing around HubSpot's platform and the promised economics of the program, while internally moving to restrict or revoke key commission and tier benefits without adequate disclosure or meaningful opportunity for Plaintiff to mitigate its reliance;

(b) Continuing to market the Solutions Partner Program, including tier and "legacy" commission benefits, as stable and attractive features even as HubSpot implemented or contemplated changes that materially reduced the value of those benefits; and

(c) Exercising any supposed contractual and policy-based discretion HubSpot alleges to hold regarding tier status, commissions, and benefits in bad faith, inconsistently with its own written materials, so as to fundamentally alter the benefit of the bargain for legacy customers for which all or most of the heretofore required performance by Connection had already been fully performed, and do so in a manner that misled Plaintiff as to its rights and economic expectations.

88. These acts and practices offend established concepts of fairness and honesty in the marketplace, are immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to Plaintiff that is not outweighed by any countervailing benefits and that Plaintiff could not reasonably have avoided.

89. HubSpot's unfair and deceptive acts and practices occurred in the conduct of trade or commerce and were directed at Plaintiff as a business participant in the marketplace. The conduct caused Plaintiff substantial injury.

90. By engaging in the acts alleged in this Complaint, HubSpot's violations of the Unfair Trade Practices Statute were willful and knowing. Prior to August 2025, HubSpot was the

18

subject of intense backlash and criticism by Partners, and on information and belief was well aware that its conduct was an unfair and/or deceptive business practice. HubSpot nevertheless persisted in the challenged conduct and refused to cure, rolling out these massive underpayments in August 2025 and continuing thereafter.

91.     As a direct and proximate result of HubSpot's unfair and deceptive acts and practices, Plaintiff has suffered actual damages in an amount to be determined at trial. Under Mass. Gen. Laws ch. 93A, § 11, and/or any comparable applicable state statute, Plaintiff is entitled to recover its actual damages, which may be doubled or trebled for willful or knowing violations, together with reasonable attorneys' fees and costs.

**COUNT IV**
**PROMISSORY ESTOPPEL**
*(Pled in the alternative)*

92.     Plaintiff realleges and incorporates by reference each paragraph of this Complaint as if fully stated herein, to the extent they are consistent with this claim and without waiving Plaintiff's position that a valid and enforceable contract governs the parties' relationship.

93.     To the extent there is a finding that some or all of HubSpot's relevant promises are not enforceable as contractual obligations (for example, because the Court deems them outside the written Agreement or Program Policies), Plaintiff asserts this claim for promissory estoppel in the alternative.

94.     HubSpot made clear and definite promises to Plaintiff, including but not limited to Plaintiff, as a qualified Solutions Partner at a given tier, receiving a 20% revenue share on Net Revenue for the lifetime of each customer's subscription brought in by Connection.

95.     HubSpot reasonably expected and intended that Plaintiff would rely on these promises. These lifetime revenue share representations were widely distributed through Connections' peer group, widely publicized and promoted by HubSpot, who marketed these

programs and benefits to induce partners including Plaintiff to join, remain in, and actively invest in the Solutions Partner Program.

96.    Plaintiff did, in fact, reasonably, detrimentally and foreseeably rely on HubSpot's promises by, among other things:

(a)    Joining and remaining in the Solutions Partner Program, rather than partnering with competing platforms;

(b)    Building its business model, staffing, marketing, and service offerings around HubSpot's products and the promised commission and tier benefits;

(c)    Devoting substantial resources to selling, implementing, and actively managing HubSpot End Users, including customers closed before April 1, 2023;

(d)    Training such customers to be self-sufficient and valuing flexibility over active management where appropriate; and

(e)    Foregoing other business opportunities and revenue streams in reliance on the expectation of ongoing lifetime commissions and tier-based benefits.

97.    Plaintiff's reliance on HubSpot's promises was reasonable in light of HubSpot's written program materials, repeated representations, and ongoing communications about the commission, tier, and legacy benefits of the Solutions Partner Program.

98.    Despite Plaintiff's reliance and substantial performance, HubSpot failed to honor its promises by, among other things:

(a)    Cutting off or reducing commissions and revenue share on customers for which Plaintiff had been promised lifetime or continued commissions;

(b)    Purporting to apply new, less favorable commission rules to Plaintiff's legacy deals that were promised continued revenue share under the Legacy Commission Plan; and

(c)    Failing to provide or maintain the tier-based benefits that HubSpot had represented would accompany Plaintiff's achieved tier.

99.    Plaintiff suffered substantial detriment and damages as a direct result of its reliance on HubSpot's promises, including lost commissions and revenue share, lost value of tier-based

benefits, sunk investments in building a HubSpot-centric practice, lost opportunities for active management of accounts, and foregone alternative business opportunities.

100.    Injustice can be avoided only by enforcing HubSpot's promises to the extent necessary to compensate Plaintiff for its reliance, or by awarding reliance and/or expectation damages commensurate with Plaintiff's losses.

**COUNT V**
**DECLARATORY JUDGMENT AND FURTHER RELIEF**
*(28 U.S.C. §§ 2201, 2202; Fed. R. Civ. P. 57)*

101.    Plaintiff incorporates by reference each paragraph of this Complaint as if fully set forth herein.

102.    An actual, present, and justiciable controversy exists between Plaintiff and Defendant HubSpot within the meaning of 28 U.S.C. § 2201 and Article III of the United States Constitution. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

103.    Specifically, Plaintiff and Defendant have adverse legal interests regarding the Agreement, and whether 20% lifetime revenue sharing must be paid to Connection for customers signed-up with HubSpot before April 1, 2023 whether or not actively managed by Connection, with HubSpot contending it is not.

104.    The parties' dispute is ripe for adjudication. Connection has suffered, and continues to suffer, concrete harm as a result of the existing uncertainty and Defendant's adverse position, including inability to engage in lawful conduct and continuing economic injury.

105.    Pursuant to 28 U.S.C. § 2201, this Court has authority to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief

is or could be sought," and any such declaration "shall have the force and effect of a final judgment or decree."

106.    There is no adequate remedy at law to resolve the legal uncertainty created by Defendant's position. A declaratory judgment is necessary and appropriate to establish the respective rights and obligations of the parties and to terminate the existing controversy.

107.    Pursuant to 28 U.S.C. § 2202, after the Court enters a declaratory judgment determining the rights of the parties, Plaintiff further seeks all necessary and proper further relief against Defendant, including interim and permanent injunctive relief requiring such ongoing payments and prohibiting HubSpot from ceasing such payments, damages, and attorney's fees, as this Court may deem appropriate after reasonable notice and hearing.

<strong>RESERVATION OF RIGHTS</strong>

Plaintiff expressly reserves the right to amend this Complaint, as permitted by Federal Rule of Civil Procedure 15, including (without limitation) to assert class allegations and to seek certification of one or more classes pursuant to Federal Rule of Civil Procedure 23 including as further facts are developed in discovery.

<strong>REQUEST FOR RELIEF</strong>

Plaintiff Connection Model LLC requests that the Court enter judgment in its favor and against Defendant HubSpot, Inc. as follows:

A.  As to Count I, a judgment awarding monetary damages for breach of contract in an amount to be determined at trial;

B.  As to Count II, a judgment awarding monetary damages for the breach of the implied duty of good faith and fair dealing in an amount to be determined at trial;

22

C.  As to Count III, a judgment awarding Plaintiff its actual damages, to be multiplied as permitted by Mass. Gen. Laws c. 93A, § 11, and/or the applicable Unfair Trade Practices Statute and Plaintiff's reasonable attorneys' fees and costs as allowed by statute;

D.  to Count IV, a judgment enforcing HubSpot's promises to the extent necessary to avoid injustice, awarding Plaintiff damages measured by its reliance and/or expected benefits (including unpaid and underpaid commissions and lost tier-based benefits), together with interest, costs, and such other relief as the Court deems just and proper;

E.  As to Count V, enter a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 declaring that the 20% lifetime revenue shared commissions are owed, and an ongoing lifetime obligation of HubSpot, and further relief consistent with such declaration should be entered including without limit an interim and permanent injunction requiring such ongoing payments and prohibiting HubSpot from ceasing such payments, compensatory and/or consequential damages in an amount to be proven at trial, together with interest, costs, and such other relief as the Court deems just and proper;

F.  As to all Counts I-IV, interim and permanent injunctive relief and judgment enjoining HubSpot to continue with the 20% lifetime revenue share and prohibiting its cessation;

G.  An order requiring HubSpot to pay both pre- and post-judgment interest on any amounts awarded;

H.  That the Court permit Plaintiff to amend its Complaint as a matter of course or with leave of court, including (without limitation) to add additional parties and causes of action, to assert class allegations, and to seek certification of a plaintiff class pursuant to applicable law and Federal Rules of Civil Procedure 23, as may be appropriate; and

I.  Such other or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated: June 17, 2026

Respectfully submitted,

**CONNECTION MODEL LLC**

By its attorneys,

//s// *Maria A. Lombardi*
Maria A. Lombardi (BBO#: 713352)
**TROUTMAN PEPPER LOCKE LLP**
111 Huntington Avenue, 9th Floor
Boston, MA 02199
Telephone (617) 204-5186
Maria.Lombardi@troutman.com

Benjamin (Ben) L. Wagner (*pro hac vice forthcoming*)
**TROUTMAN PEPPER LOCKE LLP**
11682 El Camino Real, Suite 400
San Diego CA 92130
Telephone (858) 509-6010
Ben.Wagner@troutman.com

## CERTIFICATE OF SERVICE

I, Maria A. Lombardi, hereby certify that a true and correct copy of the foregoing document is being served by hand upon the corporate Defendant at its registered agent in Massachusetts, with an address of CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

/s/ *Maria A. Lombardi*
Maria A. Lombardi