**RE SUNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

CONNECTION MODEL LLC,

Plaintiff,

v.

HUBSPOT, INC.,

Defendant.

Civil Action No. 1:26-cv-12753-AK

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT HUBSPOT, INC.'S MOTION TO DISMISS PLAINTIFF CONNECTION MODEL LLC'S COMPLAINT**

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ....................................................................................................2

A. The HubSpot Solutions Partner Program Agreement ............................................2

1. Termination Provisions ....................................................................3

2. Integration Clauses ....................................................................4

3. Modification Provisions ....................................................................5

4. Commission Provisions ....................................................................5

5. Program Policies ....................................................................6

B. HubSpot Solutions Partner Program Tiers and Benefits Guide ..............................7

C. The VAR Tier Program Brochure ....................................................................7

D. HubSpot Modifies the Agreement Pursuant to its Terms ......................................7

E. HubSpot Reduces Revenue Payments To Connection In Accordance With Previously Announced Modifications, And Connection Files This Lawsuit ..........8

LEGAL STANDARD ....................................................................................................9

ARGUMENT ....................................................................................................9

I. CONNECTION'S BREACH OF CONTRACT CLAIM FAILS BASED ON THE AGREEMENT'S PLAIN TERMS (COUNT I) ..................................................9

A. The Express Contract Terms Preclude Any Expectation Of "Lifetime" Commissions ....................................................................................10

B. Connection Accepted Modifications Through Continued Participation ................12

II. CONNECTION CANNOT CONVERT HUBSPOT'S EXERCISE OF CONTRACTUAL RIGHTS INTO AN IMPLIED COVENANT CLAIM (COUNT II) ....................................................................................15

III. CONNECTION HAS NOT PLEADED A VIABLE VIOLATION OF CHAPTER 93A (COUNT III) ....................................................................17

IV. CONNECTION'S PROMISSORY ESTOPPEL CLAIM FAILS AS A MATTER OF LAW (COUNT IV) ..... 18

V. CONNECTION'S DECLARATORY JUDGMENT CLAIM IS ENTIRELY DERIVATIVE AND DUPLICATIVE (COUNT V) ..... 20

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ahern v. Scholz*,
85 F.3d 774 (1st Cir. 1996) ....................17

*Artuso v. Vertex Pharms., Inc.*,
637 F.3d 1 (1st Cir. 2011) ....................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................9

*Bekele v. Lyft, Inc.*,
918 F.3d 181 (1st Cir. 2019) ....................12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................9

*Bos. Med. Ctr. Corp. v. Sec'y of Exec. Off. of Health & Hum. Servs.*,
974 N.E.2d 1114 (Mass. 2012) ....................15

*Brooks v. AIG SunAmerica Life Assurance Co.*,
480 F.3d 579 (1st Cir. 2007) ....................9

*Cheng v. Neumann*,
51 F.4th 438 (1st Cir. 2022) ....................9

*Cochran v. Quest Software, Inc.*,
328 F.3d 1 (1st Cir. 2003) ....................14

*Doe v. Brandeis Univ.*,
177 F. Supp. 3d 561 (D. Mass. 2016) ....................19

*Dubliner, Inc. v. E. Coast Tavern Grp., Inc.*,
706 F. Supp. 3d 181 (D. Mass. 2023) ....................8

*Edlow v. RBW, LLC*,
688 F.3d 26 (1st Cir. 2012) ....................10, 15

*EDV & CAD Grp. v. Scopic Software LLC*,
771 F. Supp. 3d 33 (D. Mass. 2025) ....................16

*Gen. Convention of New Jerusalem in the U.S., Inc. v. MacKenzie*,
874 N.E.2d 1084 (Mass. 2007) ....................11

*Gishen v. Dura Corp.*,
285 N.E.2d 117 (Mass. 1972) ........................................................................12, 13, 14

*Goldstein v. Enanta Pharms., Inc.*,
2011 WL 1795282 (Mass. App. Ct. 2011)...........................................................................17

*Graphic Arts Finishers, Inc. v. Bos. Redevelopment Auth.*,
255 N.E.2d 793 (Mass. 1970) ..............................................................................................14

*Greene v. Ablon*,
794 F.3d 133 (1st Cir. 2015)...........................................................................................12, 14

*In re Fid. Erisa Fee Litig.*,
990 F.3d 50 (1st Cir. 2021)...................................................................................................3, 6

*Infinity Fluids, Corp. v. Gen. Dynamics Land Sys., Inc.*,
2013 WL 3158094 (D. Mass. June 19, 2013)..........................................................................8

*James B. Nutter & Co. v. Est. of Murphy*,
88 N.E.3d 1133 (Mass. 2018) ................................................................................................12

*Kahalas v. Schiller*,
164 F. Supp. 3d 241 (D. Mass. 2016) ...................................................................................17

*Kobayashi v. Orion Ventures, Inc.*,
678 N.E.2d 180 (Mass. App. Ct. 1997) ...............................................................................17

*Krumsiek v. Collins Elec. Co.*,
251 N.E.3d 1215 (Mass. App. Ct. 2025) ..............................................................................11

*Lanza v. Fin. Indus. Regul. Auth.*,
953 F.3d 159 (1st Cir. 2020)....................................................................................................15

*Madan v. Royal Indem. Co.*,
532 N.E.2d 1214 (Mass. App. Ct. 1989) ..............................................................................17

*Malden Police Patrolman's Ass'n v. Malden*,
82 N.E.3d 1055 (Mass. App. Ct. 2017) ...............................................................................19

*Masingill v. EMC Corp.*,
870 N.E.2d 81 (Mass. 2007) ....................................................................................................20

*McCartin v. Westlake*,
630 N.E.2d 283 (Mass. App. Ct. 1994) ...............................................................................18

*Okerman v. VA Software Corp.*,
871 N.E.2d 1117 (Mass. App. Ct. 2007) ..............................................................................12

*Okmyansky v. Herbalife Int'l of Am., Inc.*,
415 F.3d 154 (1st Cir. 2005)....19

*R.I. Hosp. Tr. Nat'l Bank v. Varadian*,
647 N.E.2d 1174 (Mass. 1995)....19

*Robert E. Ricciardelli Carpet Serv., Inc. v. Home Depot U.S.A., Inc.*,
679 F. Supp. 2d 192 (D. Mass. 2010)....15

*Shaulis v. Nordstrom, Inc.*,
865 F.3d 1 (1st Cir. 2017)....15

*Sierra v. Bisignano*,
158 F.4th 43 (1st Cir. 2025)....9

*Sonoiki v. Harvard Univ.*,
37 F.4th 691 (1st Cir. 2022)....19

*Tody's Serv., Inc. v. Liberty Mut. Ins. Co.*,
260 N.E.3d 309 (Mass. 2025)....18

*Tomer v. Hollister Assocs., Inc.*,
70 Mass. App. Ct. 1104 (Mass. App. Ct. 2007)....16

*Trifiro v. N.Y. Life Ins. Co.*,
845 F.2d 30 (1st Cir. 1988)....18

*Tyler v. Michaels Stores, Inc.*,
840 F. Supp. 2d 438 (D. Mass. 2012)....20

*Walsh v. Teltech Sys. Inc.*,
2015 WL 12856456 (D. Mass. July 30, 2015)....8

*Walsh v. TelTech Sys., Inc.*,
821 F.3d 155 (1st Cir. 2016)....17

*Whittier IPA, Inc. v. Steward Health Care Network, Inc.*,
2017 WL 1449763 (Mass. Super. Ct. Jan. 19, 2017)....11

*Zurich Am. Ins. Co. v. Watts Regul. Co.*,
796 F. Supp. 2d 240 (D. Mass. 2011)....17

## STATUTES

Mass. Gen. Laws ch. 93A....17, 18

## RULES

Fed. R. Civ. P. 12....3, 9

## PRELIMINARY STATEMENT

At its core, Plaintiff Connection Model LLC's ("Connection") lawsuit fails because the contracts on which it bases its claims foreclose any argument that it was entitled to a permanent stream of revenue commissions from Defendant HubSpot, Inc. ("HubSpot"). Although Connection claims that a series of written Solutions Partner Program Agreements (the "Agreements") with HubSpot established a "lifetime" commission for sales it made beginning in 2012, each version of the Agreements expressly permitted HubSpot to terminate the Agreement and any post-termination commission payments without cause, so long as it provided the requisite notice. When a contract's terms make plain that either party can terminate for convenience, a claim premised on a permanent contractual entitlement fails as a matter of law. What is more, since 2014, the Agreements allowed HubSpot to modify the contractual terms with notice to Connection. Again, even if Connection had a credible argument that the Agreements ever entitled it to permanent commission revenue, the express term permitting HubSpot to modify the Agreement with notice dooms any claim premised on an alleged promise of lifetime commissions.

From 2012 to 2025, Connection never objected to any modifications and all along reaped the benefits of its at-will, continued participation in HubSpot's commission program. Connection participated in HubSpot's Partner Program for over a decade, accepting each modification to the Agreement along the way and earning substantial commissions in the process. Only three years after HubSpot exercised its express contractual right to adjust commission terms—a right Connection had accepted repeatedly for over a decade—did Connection file this lawsuit. But the express terms of the Agreements foreclose each of Connection's claims. Even at the pleading stage, the four corners of the Agreements and incorporated Program Policies foreclose Connection's claims that HubSpot breached a promise of "lifetime" commissions. HubSpot never made that contractual promise without possibility of termination or modification to Connection or

anyone else, and it was never reasonable for Connection to expect permanence in the face of an at-will agreement that either party could terminate for convenience. In the face of a valid contract governing the parties' business relationship, Connection cannot use equitable doctrines or statutory claims to manufacture obligations that the written contract expressly disclaimed. The Complaint should be dismissed with prejudice.

Each of the Complaint's five counts fails as a matter of law. Connection's breach of contract claim arising from an alleged right to permanent commissions (Count I) founders on the express terms of the Agreements, which were always at-will, always permitted either side to terminate for convenience, made revenue sharing contingent on active customer engagement or other eligibility requirements, and reserved HubSpot's right to modify the commission structure. Connection's implied covenant claim (Count II) impermissibly seeks to override express contractual provisions that Connection voluntarily accepted and to which HubSpot adhered. The Chapter 93A claim (Count III) fails because Connection does not allege any act that qualifies as unfair or deceptive under Massachusetts law. Connection's promissory estoppel claim (Count IV) is barred by the existence of a governing written contract between the parties covering the subject matter of the alleged promise and, in any event, fails because any reliance on informal representations of "lifetime" commissions was unreasonable as a matter of law given the Agreements' express terms. Connection's declaratory judgment claim (Count V) fails with the underlying claims.

## BACKGROUND

### A. The HubSpot Solutions Partner Program Agreement

Connection alleges that on or around 2012, Connection and HubSpot first entered into the HubSpot Solutions Partner Program Agreement (the "Agreement"), a "valid" contract that "appointed Connection as HubSpot's sales partner for the sale of HubSpot's products and

services." (Doc No. 1 ¶¶ 2, 25, 62). Several provisions of the Agreement not referenced in the Complaint are key to the Court's determination of whether Connection's pleading states a claim.[1]

### 1. Termination Provisions

Each version of the Agreement allowed either party to terminate the Agreement without cause.[2] The 2012 HubSpot Referral Partner Agreement provided that:

> Either party may terminate this Agreement on 60 days written notice to the other party .... Expiration or termination of this Agreement shall not affect HubSpot's obligation to pay Partner Referral Fees for referred customers of Partner, so long as the related payment by the customer is recognized by HubSpot within thirty (30) days after the date of such termination or expiration. ***HubSpot will not pay Partner Fees on customer payments recognized by HubSpot after that date***.

Ex. 1 § 2(b)-(c) (emphasis added). The 2014 Partner Program Agreement provided substantially identical language, stating that:

> Both you and we may terminate this Agreement on sixty (60) days written notice to the other party .... Expiration of this Agreement, and termination of this Agreement without cause by us or by you with cause, shall not affect our obligation to pay you a Revenue Share, so long as the related payment by the End User is recognized by us within thirty (30) days after the date of such termination or

---

[1] Connection did not attach the Agreement to the Complaint. Consistent with standard practice in this Circuit, however, the Agreement is incorporated by reference and is within the record at the pleading stage. *See In re Fid. Erisa Fee Litig.*, 990 F.3d 50, 53-54 (1st Cir. 2021) ("When a complaint expressly cites and relies upon a written contract in support of a claim, the drafter of the complaint cannot prevent the court from considering the written contract in ruling on a motion under Rule 12(b)(6)." (citation omitted)). Thus, HubSpot attaches versions of the Agreement between 2012 and 2026 as Exhibits 1 through 15 to this Motion. Before filing this Motion, counsel for HubSpot requested that counsel for Connection provide all versions of the Agreement on which Connection relied for its Complaint. *See* Edelman Decl. ¶ 2. Counsel for Connection provided only a 2020 agreement. *Id.*

[2] From 2012 until 2017, the Agreement required sixty days' notice for termination without cause. Ex. 1 § 2(b); Ex. 2 § 10(b); Ex. 3 § 11(b); Ex. 4 § 11(b); Ex. 5 § 11(b). In 2018, the Agreement required fifteen (15) days' notice for termination without cause, before reverting back to sixty (60) days' notice in 2019. Ex. 6 § 12(b); Ex. 7 § 11(b). From 2020 to present, the Agreement requires thirty (30) days' notice for termination without cause. Ex. 8 § 11(b); Ex. 9 § 11(b); Ex. 10 § 12(b); Ex. 11 § 12(b); Ex. 12 § 12(b); Ex. 13 § 12(b); Ex. 14 § 12(b); Ex. 15 § 12(b).

> expiration. We will not pay you fees on End User payments recognized by us after thirty (30) days after the date of such termination or expiration.

Ex. 2 § 10(b), (d). Every subsequent version of the Agreement has maintained the termination for convenience provision and the 30-day or quarter-long limitation on commissions owed thereafter. *See* Ex. 3 § 11(b), (d); Ex. 4 § 11(b), (e); Ex. 5 § 11(b), (e); Ex. 6 § 12(b), (f); Ex. 7 § 11(b), (e); Ex. 8 § 11(b), (e); Ex. 9 § 11(b), (e); Ex. 10 § 12(b), (e); Ex. 11 § 12(b), (e); Ex. 12 § 12(b), (e); Ex. 13 § 12(b), (e); Ex. 14 § 12(b), (e); Ex. 15 § 12(b), (e). Under each and every agreement, HubSpot had no obligation post-termination beyond that limited payment, and the sales partner would not be eligible to receive a Revenue Share after termination of the Agreement. Ex. 1 § 2(c); Ex. 2 § 10(d); Ex. 3 § 11(d); Ex. 4 § 11(e); Ex. 5 § 11(e); Ex. 6 § 12(f); Ex. 7 § 11(e); Ex. 8 § 11(e); Ex. 9 § 11(e); Ex. 10 § 12(e); Ex. 11 § 12(e); Ex. 12 § 12(e); Ex. 13 § 12(e); Ex. 14 § 12(e); Ex. 15 § 12(e).

### 2. Integration Clauses

In 2014, the Agreement stated that it "will replace in its entirety any existing Partner Program Agreement we might have with you." Ex. 2. Beginning with the 2014 Agreement, every further version of the Agreement included an Entire Agreement clause, making clear that "[t]his Agreement is the entire agreement between us for [the] Program and supersedes all other proposals and agreements (including all prior versions of the [Agreement, if any]), whether electronic, oral or written, between us." *Id.* § 15(i); *see* Ex. 3 § 16(i); Ex. 4 § 16(i); Ex. 5 § 16(i); Ex. 6 § 17(j); Ex. 7 § 16(j); Ex. 8 § 16(j); Ex. 9 § 16(j); Ex. 10 § 17(j); Ex. 11 § 17(j); Ex. 12 § 17(j); Ex. 13 § 17(j); Ex. 14 § 17(j); Ex. 15 § 17(j).

### 3. Modification Provisions

Beginning in 2014, each version of the Agreement permitted HubSpot to modify the Agreement's terms with notice to Connection, and provided Connection the right to promptly terminate the contract if it disagreed with any such modification:

> We may update and change any part or all of this Agreement[, including by replacing it in its entirety]. If we update or change this Agreement, the updated Agreement will be posted at [the designated URL] and we will let you know [of the change through an in-app notification in your portal or by email]. ... We encourage you to review this Agreement periodically.

Ex. 2 § 15(a); Ex. 3 § 16(a); Ex. 4 § 16(a); Ex. 5 § 16(a); Ex. 6 § 17(a); Ex. 7 § 16(a); Ex. 8 § 16(a); Ex. 9 § 16(a); Ex. 10 § 17(a); Ex. 11 § 17(a); Ex. 12 § 17(a); Ex. 13 § 17(a); Ex. 14 § 17(a); Ex. 15 § 17(a). Updates to the notification mechanism and the URL are the only changes to this provision from 2014 until present. For example, from 2014 to 2017, and in 2019, the Agreement stated:

> If you do not agree with a modification to this Agreement, [you] must notify us in writing within thirty (30) days ... If you give us this notice, this Agreement will terminate sixty (60) days after we receive this notice and our relationship will continue to be governed by the terms and conditions of the version of this Agreement applicable immediately prior to modification for the remainder of the Agreement term.

Ex. 2 § 15(a); Ex. 3 § 16(a); Ex. 4 § 16(a); Ex. 5 § 16(a); Ex. 7 § 16(a). In versions of the Agreement from 2018 and from 2020 to present, the provisions read: "If you don't agree to the update or replacement, you can choose to terminate as we describe [in this Agreement]." Ex. 6; Ex. 8; Ex. 9; Ex. 10; Ex. 11; Ex. 12; Ex. 13; Ex. 14; Ex. 15.

### 4. Commission Provisions

Subject to the termination for convenience and modification provisions set forth above, the Agreements grant Connection a non-exclusive, non-transferable right to, among other things, demonstrate and promote HubSpot products and allow companies who contract with HubSpot

("End Users") to receive and access HubSpot's services. (Doc No. 1 ¶¶ 22, 26). In return, HubSpot agreed to pay Connection a percentage of fees received from End Users who bought HubSpot's services through Connection ("Revenue Share"). (Doc No. 1 ¶¶ 22, 34-36). For more than a decade before Connection filed suit, the exact contours of these commission payments were subject to provider- and transaction-specific eligibility and administrative requirements. Ex. 1 § 1(a); Ex. 2 §§ 1, 3(c), 4; Ex. 3 §§ 1, 3(c), 4; Ex. 4 §§ 1, 3(d), 4; Ex. 5 §§ 1, 3(d), 4; Ex. 6 §§ 1, 4(d), 5; Ex. 7 §§ 1, 3(d), 4; Ex. 8 §§ 1, 3(d), 4; Ex. 9 §§ 1, 3(d), 4; Ex. 10 §§ 1, 4(a), 5; Ex. 11 §§ 1, 4(a), 5; Ex. 12 §§ 1, 4(a), 5; Ex. 13 §§ 1, 4(a), 5; Ex. 14 §§ 1, 4(a), 5; Ex. 15 §§ 1, 4(a), 5. As of 2014, for example, the Agreement provided that HubSpot would pay to Partners 20% of fees paid to HubSpot by an End User or by the Partner for an End User, subject to certain eligibility requirements, including that the Partner remain "actively engaged with the End User." Ex. 2 §§ 1, 3(c).

**5. Program Policies**

The Agreements incorporate the "Program Policies" by reference. (Doc No. 1 ¶¶ 28, 43, 50); Ex. 2 § 15(l); Ex. 3 § 16(l); Ex. 4 § 16(l); Ex. 5 § 16(l); Ex. 6 § 17(m); Ex. 7 § 16(m); Ex. 8 § 16(m); Ex. 9 § 16(m); Ex. 10 § 17(m); Ex. 11 § 17(m); Ex. 12 § 17(m); Ex. 13 § 17(m); Ex. 14 § 17(m); Ex. 15 § 17(m). Connection alleges that the HubSpot Solutions Partner Program Tiers and Benefits Guide ("Benefits Guide") is one of the incorporated Program Policies. (Doc No. 1 ¶ 43).[3] As of 2020, Revenue Share payments could be discontinued if a sales partner "fail[ed] to meet any of the eligibility criteria ... as outlined in the Program Policies at any time." Ex. 8 § 3(d); Ex. 9 § 3(d); Ex. 10 § 4(a); Ex. 11 § 4(a); Ex. 12 § 4(a); Ex. 13 § 4(a); Ex. 14 § 4(a); Ex. 15 § 4(a).

---

[3] As Connection did not attach the Benefits Guide to the Complaint, HubSpot attaches the 2020 and 2023 versions as Exhibits 16-17 to this Motion. *See In re Fid. Erisa Fee Litig.*, 990 F.3d at 53-54.

### B. HubSpot Solutions Partner Program Tiers and Benefits Guide

The Benefits Guide provides details about how Partners can receive certain benefits. (Doc No. 1 ¶ 43); Ex. 16. Prior to 2023, the Benefits Guide mentioned that Solutions Partners who met certain eligibility requirements would have "access" to certain benefits, including a twenty percent (20%) commission per deal "for Lifetime of Customer Subscription." Ex. 16 at 6-7.

### C. The VAR Tier Program Brochure

Connection also alleges that HubSpot published a VAR Tier Program Brochure (the "Brochure"). (Doc No. 1 ¶ 27). Connection does not attach the Brochure to the Complaint or allege that the Brochure is part of the Agreement. None of the Agreements mention the Brochure.

### D. HubSpot Modifies the Agreement Pursuant to its Terms

Consistent with the modification provisions discussed above, in April 2023, HubSpot modified the Agreement's commission structure. The new structure was announced in a "Program Update[]" in the 2023 Benefits Guide:

> Effective April 1, 2023 HubSpot solutions partners will earn 20% Revenue Share for three years on the value of the subscription for specific product lines sold on or after that date .... For qualified transactions closed prior to April 1, 2023, HubSpot will pay partners 20% commissions until April 1, 2025, regardless of whether the partner is managing the customer. Starting April 1, 2025, partners can continue to earn 20% commission on these legacy deals as long as they are receiving managed MRR [Monthly Recurring Revenue] credit for that customer.

Ex. 17 at 4. Starting in 2023, the incorporated Program Policies website explained that "Partner Revenue Share is equal to 20% of the monthly recurring Net Revenue and is paid for up to three (3) years. Existing partners who joined the program before February 21, 2023 and are being paid commissions will be subject to the legacy plan if they've closed a deal before April 1, 2023." Ex. 18 at 2. The linked "legacy plan" explained:

> Effective April 1, 2023, HubSpot changed the duration of the Revenue Share (commissions) term for new MRR from lifetime to three years/thirty-six (36) months for deals closed ***on or after*** April 1, 2023. For Qualified Transactions closed before April 1, 2023, partners ***will remain earning Revenue Share until April 1, 2025, regardless of whether or not they are managing the customer as long as the customer's subscription remains active. Partners can maintain Revenue Share after April 1, 2025,*** as long as the customer remains an active HubSpot subscription and the partner continues to manage that customer, as designated by managed MRR credit.

Ex. 19 at 1 (emphasis in original).[4] The legacy plan also clarified that HubSpot's determination of whether a partner continued to actively manage a customer was in HubSpot's "sole discretion." *Id.* at 3.

The Complaint contains no allegations that Connection rejected these terms or terminated its Agreement in 2023. Rather, Connection continues to receive commissions under the Agreement to this day. (*See* Doc No. 1 ¶ 41).

**E. HubSpot Reduces Revenue Payments To Connection In Accordance With Previously Announced Modifications, And Connection Files This Lawsuit**

As it announced it would in 2023, HubSpot adjusted commission payments on multiple pre-April 1, 2023 commissions in 2025. Beginning with its August 2025 quarterly commission payments, HubSpot stopped paying commissions to Connection for transactions closed before April 1, 2023, if Connection failed to continue actively managing the End User. (Doc No. 1 ¶¶ 8, 41, 59, 66). Connection filed this Complaint on June 17, 2026.

---

[4] The Court may take judicial notice of these archived versions of the Program Policies, which are "constructively a part of the [contract], and ... form a single instrument." *Infinity Fluids, Corp. v. Gen. Dynamics Land Sys., Inc.*, 2013 WL 3158094, at *4 (D. Mass. June 19, 2013); *see Dubliner, Inc. v. E. Coast Tavern Grp., Inc.*, 706 F. Supp. 3d 181, 194 (D. Mass. 2023) ("Here, the authenticity of the Wayback Machine menu captures submitted by Dubliner is not in dispute, and the captures are dispositive."); *Walsh v. Teltech Sys. Inc.*, 2015 WL 12856456, at *1 n.2 (D. Mass. July 30, 2015) (listing examples of courts taking judicial notice of archived webpages), *aff'd* 821 F.3d 155, 160 (1st Cir. 2016).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* For purposes of a motion to dismiss, the Court may consider "documents the authenticity of which are not disputed by the parties," "documents central to plaintiffs' claim," and "documents sufficiently referred to in the complaint." *Sierra v. Bisignano*, 158 F.4th 43, 49 (1st Cir. 2025) (citation omitted). When materials incorporated into the complaint contradict allegations in the complaint, "the exhibit trumps the allegations." *Cheng v. Neumann*, 51 F.4th 438, 445 (1st Cir. 2022) (citation omitted).

## ARGUMENT

### I. CONNECTION'S BREACH OF CONTRACT CLAIM FAILS BASED ON THE AGREEMENTS' PLAIN TERMS (COUNT I)

The plain language of the Agreements makes clear that there is no breach here. "In order to state a viable breach of contract claim under Massachusetts law, plaintiff[] must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff[] sustained damages as a result of the breach." *Brooks v. AIG SunAmerica Life Assurance Co.*, 480 F.3d 579, 586 (1st Cir. 2007). HubSpot did not breach any contract because the Agreements—which included provisions permitting termination for convenience and modification with notice—never promised unconditional, interminable, unmodifiable "lifetime" payments. In fact, "lifetime" payments were always entirely inconsistent with the Agreements because the contracts contained termination for convenience provisions that called for commission payments to cease soon after

termination. Moreover, each successive agreement expressly superseded previous agreements. Connection accepted each new Agreement, including the 2023 Agreement and its revised commission structure, by continuing to participate in and benefit from the sales program. Count I must be dismissed.

### A. The Express Contract Terms Preclude Any Expectation Of "Lifetime" Commissions

Under every version of the Agreement, HubSpot's obligation to pay commissions was expressly limited by a combination of termination provisions and active-engagement conditions; there was never a guarantee of unconditional, perpetual commissions. A party cannot claim breach based on obligations the counterparty did not agree to undertake. *See Edlow v. RBW, LLC*, 688 F.3d 26, 33 (1st Cir. 2012) (Massachusetts law) ("Where there is no obligation to provide under a contract, there can be no breach of that obligation."). Because the express language of the Agreements contradicts Connection's allegation that HubSpot agreed to provide unconditional, unmodifiable lifetime commissions, Connection's breach of contract claim fails.

From the outset, HubSpot's payment obligation was time limited. Every single version of the Agreement made clear that HubSpot could terminate the Agreement at any time and limit Connection to commissions on revenue received thirty days thereafter. Ex. 1 § 2(c); Ex. 2 § 10(d); Ex. 3 § 11(d); Ex. 4 § 11(e); Ex. 5 § 11(e); Ex. 6 § 12(f); Ex. 7 § 11(e); Ex. 8 § 11(e); Ex. 9 § 11(e); Ex. 10 § 12(e); Ex. 11 § 12(e); Ex. 12 § 12(e); Ex. 13 § 12(e); Ex. 14 § 12(e); Ex. 15 § 12(e). Connection's alleged expectation of "permanent" or "lifetime" Revenue Share was therefore objectively unreasonable as a matter of law—if HubSpot could limit its commission obligations to fees collected within thirty days of its exercise of an unambiguous, unilateral right to terminate the Agreement without cause, a lifetime right to fees was foreclosed. Courts assessing breach of Massachusetts contracts "must consider the meaning of the provisions that [plaintiff] claims were

breached 'in the context of the entire contract'" and not in isolation. *Whittier IPA, Inc. v. Steward Health Care Network, Inc.*, 2017 WL 1449763, at *4 (Mass. Super. Ct. Jan. 19, 2017) (quoting *Gen. Convention of New Jerusalem in the U.S., Inc. v. MacKenzie*, 874 N.E.2d 1084, 1087 (Mass. 2007)). That context matters here because even under an early version of the Agreement, Revenue Share was contingent on active engagement with the End User. Section 3(c) of the 2014 Agreement, for example, stated: "We might also determine that you are not eligible for a Revenue Share if you are no longer actively engaged with the End User. ... We may discontinue Revenue Share payment should any of the eligibility criteria set forth in this subsection fail to be met at any time." Ex. 2 § 3(c). Revenue Share was thus never unconditionally "lifetime"—it was always plainly limited by conditions on eligibility and the Program Policies. Connection's breach of contract claim fails because it is premised on a plain misreading of the Agreement, considering the contract expressly limited post-termination payments to amounts already collected and conditioned payment on eligibility requirements. *See Artuso v. Vertex Pharms., Inc.*, 637 F.3d 1, 8 (1st Cir. 2011) (Massachusetts law) (affirming dismissal of breach of contract claim based on "misreading of the Agreement"); *see also Krumsiek v. Collins Elec. Co.*, 251 N.E.3d 1215, 1221 (Mass. App. Ct. 2025) ("In interpreting a contract, [t]he objective is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose." (quotation omitted)).

For all of the rhetoric in the Complaint, Connection's breach of contract claim fails as a matter of law because Connection's interpretation of the Agreements as granting it an unextinguishable, perpetual commission right reads the termination and various active-engagement terms out of the Agreement. That is not permitted under Massachusetts law, which requires that a contract be interpreted "to give reasonable effect to each of its provisions."

*James B. Nutter & Co. v. Est. of Murphy*, 88 N.E.3d 1133, 1139 (Mass. 2018) (quotation omitted). Here, Connection's theory rests on an interpretation of the Agreement that would render the termination-without-cause clause, among others, meaningless. After all, it cannot be both that commissions were expressly limited to those received by HubSpot within thirty days after termination and that HubSpot was required to pay those commissions perpetually. Accordingly, Connection's breach of contract claim fails as a matter of law.

### B. Connection Accepted Modifications Through Continued Participation

Even setting aside the termination and active-engagement provisions, Connection's breach of contract claim independently fails because HubSpot permissibly modified the Agreement's commission structure to require active management of End Users as a condition of receiving further commissions attributable to those End Users. A contractual modification is enforceable where there is "mutual assent and consideration." *Okerman v. VA Software Corp.*, 871 N.E.2d 1117, 1125 (Mass. App. Ct. 2007) (citing *Gishen v. Dura Corp.*, 285 N.E.2d 117, 121 (Mass. 1972)). Under the Agreements' terms, Connection assented by failing to object or terminate the contract. It received consideration for the modifications in the form of its continued participation in the Program and ability to make new sales and reap commissions therefrom. Accordingly, the 2023 modification was enforceable, and any alleged prior right to perpetual commissions was properly modified.

*First*, Connection assented to the modification. "Assent may be inferred from conduct," *Greene v. Ablon*, 794 F.3d 133, 147 (1st Cir. 2015) (Massachusetts law), including continuing to operate under a contract post-modification where the contract defines continued operation as assent, *see, e.g.*, *Bekele v. Lyft, Inc.*, 918 F.3d 181, 184, 190 (1st Cir. 2019) (Massachusetts law) (finding assent to modification where contract stated: "If We post amended terms on the Lyft platform, You may not use the Services without accepting them"). Here, from the earliest versions

of the Agreement, HubSpot reserved the express right to modify the contract, and explained that Connection could either object, terminate, or assent. *See, e.g.*, Ex. 2 § 15(a) ("If you do not agree with a modification to this Agreement, [you] must notify us in writing within thirty (30) days after receiving notice of modification. If you give us this notice, this Agreement will terminate sixty (60) days after we receive this notice and our relationship will continue to be governed by the terms and conditions of the version of this Agreement applicable immediately prior to modification for the remainder of the Agreement term."). Connection does not plead that it sent any such termination notice. Accordingly, Connection cannot plausibly allege that it did not consent to every modification, including changes to the commission structure, until it filed suit. *Cf. Gishen*, 285 N.E.2d at 121 ("[A]s [a] matter of law, there were both consideration and assent for the February modification in [the plaintiff's] continuing to work for [the defendant], with its knowledge and approval, at considerably lower commission rates.").[5]

Indeed, the Complaint provides further proof that Connection assented to the modifications. The Complaint states the parties entered into the Agreement around 2012. (Doc No. 1 ¶ 25). It then quotes the Agreement as stating "a contract between you (the Partner or Provider, together addressed as Participant(s)) and us (HubSpot)." *Id.* But that language does not appear in the 2012 version of the Agreement; it does not appear until a 2020 version of the Agreement in which HubSpot united its Partner and Provider programs. *Compare* Ex. 1, *and* Ex. 7, *with* Ex. 8. The same is true of Connection's other quotations from the Agreement: the Agreement

---

[5] This analysis applies with equal force to the Benefits Guide. Although the Benefits Guide originally mentioned "lifetime" commissions, the Agreement expressly permitted HubSpot to modify the incorporated Program Policies "from time to time by updating [its] website." *See, e.g.*, Ex. 4 § 16(l). Moreover, if the Benefits Guide was part of the Agreement via incorporation, the Agreement's general modification provisions apply to it as well. Connection's continued participation in the Program without exercising its termination right constituted acceptance of modifications to the Benefits Guide as a matter of law.

had already been modified for years by 2020 when it first included definitions for both "Partner Revenue Share" and "Provider Revenue Share." (Doc No. 1 ¶ 35); *compare* Ex. 1, *and* Ex. 7, *with* Ex. 8. Rather than alleging it took issue with or lacked awareness of HubSpot's exercise of its right to modify the contract by posting new terms and Program Policies, Connection embraces those modifications as part of the contract it seeks to enforce. Connection thus implicitly admits that the Agreement it originally signed was subject to modification, and that in general the modifications were valid. Connection's pleading is thus further "conduct" from which its "[a]ssent may be inferred." *Greene*, 794 F.3d at 147.

*Second*, Connection's continued receipt of commissions consistent with the go-forward terms supplied the consideration necessary to support each modification. Consideration to support a modification "is enough if it is valuable." *Graphic Arts Finishers, Inc. v. Bos. Redevelopment Auth.*, 255 N.E.2d 793, 796 (Mass. 1970). If Connection had not agreed to the modifications, it would not have received commissions for its post-2023 work selling HubSpot's products and services. Connection guaranteed its ability to refer new End Users and earn commissions under the then-applicable contract on new transactions by remaining in the sales program rather than terminating the Agreement.[6] (*See* Doc No. 1 ¶ 41 (noting that HubSpot continues to pay some commissions to Connection)). That is sufficient consideration to make the complained-of modification enforceable. *See Gishen*, 285 N.E.2d at 121 (holding that continuing to work and receive payment at lower modified commission rates qualifies as consideration for contract modifications); *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 10 (1st Cir. 2003) (Massachusetts law) (holding that continued performance after modification of employment contract where "the

---

[6] Connection nowhere alleges that it was impermissible for HubSpot to grant only three years of commissions for sales made after 2023.

employee had no right to continued employment and the employer had no right to the employee's future services" satisfies consideration requirement).

For these reasons, Count I fails as a matter of law and should be dismissed.

## II. CONNECTION CANNOT CONVERT HUBSPOT'S EXERCISE OF CONTRACTUAL RIGHTS INTO AN IMPLIED COVENANT CLAIM (COUNT II)

Connection's claim for breach of the implied covenant of good faith and fair dealing (Count II) fails because the implied covenant cannot override or contradict express contract terms. Under Massachusetts law, "the implied covenant of good faith and fair dealing 'does not create rights or duties beyond those the parties agreed to when they entered into the contract.'" *Lanza v. Fin. Indus. Regul. Auth.*, 953 F.3d 159, 164 (1st Cir. 2020) (quoting *Bos. Med. Ctr. Corp. v. Sec'y of Exec. Off. of Health & Hum. Servs.*, 974 N.E.2d 1114, 1126 (Mass. 2012)). "Similarly, it is clear that a party cannot weaponize the implied covenant in a manner that contradicts the plain terms of a contract." *Id.* Where an action "was expressly permitted by the agreement," an implied covenant claim fails absent "a plausible allegation of bad faith." *Edlow*, 688 F.3d at 36. Connection's attempt to recast HubSpot's lawful exercise of its contractual rights as "bad faith" fails as a matter of law.

*First*, Connection had no vested right to perpetual commissions under an Agreement that expressly reserved the right to modify terms and terminate at will. The implied covenant cannot be invoked to override contractual rights that Connection accepted when it entered the Agreement. *See Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 n.7 (1st Cir. 2017) (Massachusetts law) ("[T]he implied covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship."). Nor can there be a "claim for a breach of the covenant based on a party's exercise of its explicitly conferred contractual rights." *Robert E. Ricciardelli Carpet Serv., Inc. v. Home Depot U.S.A., Inc.*, 679 F. Supp. 2d 192, 207 (D. Mass.

2010); *see EDV & CAD Grp. v. Scopic Software LLC*, 771 F. Supp. 3d 33, 50 (D. Mass. 2025) ("Where ... a party 'has exercised an express contractual power in good faith—that is, in a manner that comports with the parties' reasonable expectations as to performance,' there can be no actionable claim for breach of the covenant of good faith and fair dealing." (citation omitted)). What Connection characterizes as "curtail[ment]" and "recapture" was simply HubSpot's exercise of its contractual right to modify compensation terms—a right that Connection accepted when it entered and continued to participate in the Program. *See supra* Section I.B.

*Second*, the Agreement's structure, which allowed Partners to terminate if they disagreed with modifications, was disclosed from the outset, and Connection could have terminated the Agreement rather than accept modified terms. Connection does not allege that the then-operative terms of the Agreement were hidden from it. Connection's arguments that HubSpot "unilateral[ly] demand[ed] ... additional performance in the form of active account management" in an attempt "to completely restructure the nature of the agreement" (Doc No. 1 ¶ 78), are unavailing. Active-engagement provisions have long been included in the Agreements, *see supra* Section I.A, and the Agreement's modification provisions expressly permitted HubSpot to amend program terms. *See supra* Section I.B. The mere assertion that a party "had no choice" but to accept the modification does not alter this analysis. *Cf. Tomer v. Hollister Assocs., Inc.*, 70 Mass. App. Ct., at *3-4 (2007) (unpublished disposition) (concluding that "in continuing to work for [the defendant] after his salary was reduced, [the employee] assented to and received adequate consideration for the modifications," even where the employee had "voiced his objection").

Because the implied covenant cannot create obligations beyond those the parties agreed to and because HubSpot's conduct fell squarely within the Agreement's express terms, Count II should be dismissed.

## III. CONNECTION HAS NOT PLEADED A VIABLE VIOLATION OF CHAPTER 93A (COUNT III)

Connection's Chapter 93A claim (Count III) fails because the alleged conduct is neither unfair nor deceptive—it is simply the ordinary stuff of business arrangements between companies and independent contractors. That is not enough under Chapter 93A, because "[a] plaintiff seeking relief under Chapter 93A must prove that the defendant engaged in 'unfair or deceptive acts or practices in the conduct of any trade or commerce.'" *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016) (quoting Mass. Gen. Laws ch. 93A, § 2). "A corporate plaintiff faces 'a stricter standard than consumers in terms of what constitutes unfair or deceptive conduct.'" *Kahalas v. Schiller*, 164 F. Supp. 3d 241, 248 (D. Mass. 2016) (quotation omitted).

*First*, Connection does not allege unfair conduct. "[T]he mere breach of a contract, without more, does not amount to a [Chapter] 93A violation." *Zurich Am. Ins. Co. v. Watts Regul. Co.*, 796 F. Supp. 2d 240, 244 (D. Mass. 2011) (quoting *Madan v. Royal Indem. Co.*, 532 N.E.2d 1214, 1217 (Mass. App. Ct. 1989)). Rather, "the breach must be 'so egregious as to possess an extortionate quality that gives it the rancid flavor of unfairness.'" *Id.* (quoting *Goldstein v. Enanta Pharms., Inc.*, 2011 WL 1795282, at *1 (Mass. App. Ct. 2011)). Connection's Chapter 93A claim is predicated on conduct surrounding HubSpot's alleged breach of the Agreement's commission structure—conduct that, even if proven, would not satisfy this exacting standard. *See Ahern v. Scholz*, 85 F.3d 774, 799 (1st Cir. 1996) (holding that even a knowing breach "in order to gain a benefit—[the plaintiff's] share of the royalties" did not rise to the level of a Chapter 93A violation because that "would be true of any knowing breach of a contract"). Because this case "involve[s] 'an ordinary contract dispute' between sophisticated commercial players," the Chapter 93A claim must be dismissed. *Zurich*, 796 F. Supp. 2d at 245 (quoting *Kobayashi v. Orion Ventures, Inc.*, 678 N.E.2d 180, 189 (Mass. App. Ct. 1997)) (dismissing Chapter 93A counterclaim).

*Second*, Connection does not allege deceptive conduct—much less deceptive conduct upon which it reasonably relied. In the context of alleged deception, "a violation of Mass. G.L. c. 93A require[s] reasonable reliance." *Trifiro v. N.Y. Life Ins. Co.*, 845 F.2d 30, 33 (1st Cir. 1988). As set forth above, the Agreements unambiguously reserved HubSpot's right to modify the commission structure and to terminate the relationship. *See supra* Section I. Connection, a fellow commercial entity, cannot claim to have been deceived by marketing materials when the governing contract expressly disclaimed any unmodifiable commitment. *See McCartin v. Westlake*, 630 N.E.2d 283, 290 (Mass. App. Ct. 1994) (reversing Chapter 93A judgment for franchisees where alleged misrepresentations during negotiations regarding support services and business expansion plans were contradicted by the written franchise agreement, because franchisees who "understood and agreed to be bound only by the written agreement" could not "reasonably rely upon any contrary or different statements made to them during negotiations"). Because Connection has not pleaded reasonable reliance on any misrepresentation, its Chapter 93A claim fails.

For these reasons, Count III fails as a matter of law and should be dismissed.

## IV. CONNECTION'S PROMISSORY ESTOPPEL CLAIM FAILS AS A MATTER OF LAW (COUNT IV)

Connection's promissory estoppel claim (Count IV) fails for two independent reasons. *First*, the equitable doctrine of promissory estoppel does not apply where, as here, an enforceable contract governs the parties' relationship, regardless of whether the contract was breached. *Second*, reliance on any alleged promise of lifetime commissions was unreasonable as a matter of law. Either deficiency independently warrants dismissal. *See Tody's Serv., Inc. v. Liberty Mut. Ins. Co.*, 260 N.E.3d 309, 314 (Mass. 2025) ("To prevail on a promissory estoppel claim, [a plaintiff] must show (1) a representation intended to induce reliance; (2) reasonable reliance on that representation; and (3) resulting detriment.").

*First*, it is black-letter Massachusetts law that "[w]here an enforceable contract exists ... a claim for promissory estoppel will not lie." *Malden Police Patrolman's Ass'n v. Malden*, 82 N.E.3d 1055, 1064 (Mass. App. Ct. 2017). Connection's own Complaint alleges that "a valid and enforceable contract governs the parties' relationship" (Doc No. 1 ¶ 92), making a claim for promissory estoppel unavailable as a matter of law. *See Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 162 (1st Cir. 2005) (Massachusetts law) (holding that the conceded existence of a "valid express contract" "bar[red] the application of the equitable doctrines" that the plaintiff invoked); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 612 (D. Mass. 2016) ("[R]ecovery under a quasi-contract theory is not available where there is a written contract governing the same subject matter."). Connection's allegations that HubSpot made an oral statement or informal communications in the face of a written contract cannot represent a "promise" or "commitment" for promissory estoppel purposes because the existence of a written contract demonstrates the parties' intention that it would govern their intricate transaction. *R.I. Hosp. Tr. Nat'l Bank v. Varadian*, 647 N.E.2d 1174, 1179 (Mass. 1995).

Connection's attempt to plead promissory estoppel "in the alternative" (Doc No. 1 ¶ 93), is unavailing. Neither Connection nor HubSpot disputes that a valid contract exists; Connection seeks instead to *supplement* that contract with additional terms through promissory estoppel only "[t]o the extent there is a finding that some or all of HubSpot's relevant promises are not enforceable as contractual obligations." *Id.* That is precisely what the law forbids. *See Brandeis Univ.*, 177 F. Supp. 3d at 613 (observing that while "[i]t is true that plaintiffs may plead causes of action in the alternative," they may not "seek[] to use promissory estoppel to fill in one or more of the gaps in the contract itself"). The conceded existence of a valid contract thus forecloses Connection's promissory estoppel claim even when pleaded in the alternative. *See Sonoiki v.*

*Harvard Univ.*, 37 F.4th 691, 716-17 (1st Cir. 2022) (Massachusetts law) (holding district court did not err by declining to consider promissory estoppel "as an alternative liability theory" where "parties were not disputing that a contract existed between them and governed their relationship").

*Second*, even if promissory estoppel were available, Connection cannot establish reasonable reliance. "It is unreasonable as a matter of law to rely on prior oral representations that are (as a matter of fact) specifically contradicted by the terms of a written contract." *Masingill v. EMC Corp.*, 870 N.E.2d 81, 89 (Mass. 2007). As discussed in Part I, *supra*, the Agreement's express modification provisions, termination rights, eligibility requirements, and active-engagement conditions demonstrate that any belief in immutable "lifetime" commissions was objectively unreasonable.

For these reasons, Count IV fails as a matter of law and should be dismissed.

## V. CONNECTION'S DECLARATORY JUDGMENT CLAIM IS ENTIRELY DERIVATIVE AND DUPLICATIVE (COUNT V)

Connection's declaratory judgment claim (Count V) fails with the underlying claims. "The Declaratory Judgment Act is not an independent grant of federal jurisdiction ... so dismissal of the underlying claims requires dismissal of the claim for declaratory relief as well." *Tyler v. Michaels Stores, Inc.*, 840 F. Supp. 2d 438, 452 (D. Mass. 2012) (citations omitted). Because Counts I-IV fail for the reasons stated above, Count V must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant this Motion to Dismiss and dismiss the Complaint with prejudice.

Dated: August 14, 2026

Respectfully submitted,

/s/ *Nathan A. Sandals*
Nathan A. Sandals (BBO # 696032)
Zachary R. Edelman (BBO # 718211)
Sophie C.E. d'Orchimont (BBO # 716833)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
nathan.sandals@lw.com
zach.edelman@lw.com
sophie.dorchimont@lw.com

*Attorneys for Defendant HubSpot, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent on August 14, 2026, to those identified as non-registered participants.

/s/ Nathan A. Sandals
Nathan A. Sandals