**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CONNECTION MODEL LLC,<br><br>Plaintiff,<br><br>v.<br><br>HUBSPOT, INC.,<br><br>Defendant. | Civil Action No. 1:26-cv-12753-AK |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT HUBSPOT, INC.'S MOTION TO DISMISS PLAINTIFF CONNECTION MODEL LLC'S AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ....................1

BACKGROUND ....................2

- A. The HubSpot Solutions Partner Program Agreement ....................2
  - 1. Termination Provisions ....................2
  - 2. Integration Clauses ....................3
  - 3. Modification Provisions ....................3
  - 4. Commission Provisions ....................4
  - 5. Program Policies ....................5
- B. The VAR Tier Program Brochure ....................5
- C. HubSpot Modifies The Agreement Pursuant To Its Terms ....................5
- D. HubSpot Revises Connection's Go-Forward Revenue Share Consistent With Previously Announced Modifications, And Connection Files This Lawsuit ....................6

LEGAL STANDARD ....................7

ARGUMENT ....................7

I. CONNECTION'S BREACH OF CONTRACT CLAIM FAILS BASED ON THE AGREEMENTS' PLAIN TERMS (COUNT I) ....................7
- A. The Express Contract Terms Preclude Any Expectation Of "Lifetime" Commissions ....................8
- B. Connection Accepted Modifications Through Continued Participation ....................11
- C. Connection's Illusoriness Contention Is Incorrect And Self-Defeating ....................13

II. CONNECTION CANNOT CONVERT HUBSPOT'S EXERCISE OF CONTRACTUAL RIGHTS INTO AN IMPLIED COVENANT CLAIM (COUNT II) ....................14

III. CONNECTION HAS NOT PLEADED A CHAPTER 93A CLAIM (COUNT III) ....................15
- A. Connection Does Not Allege Unfair Conduct ....................16
- B. Connection Does Not Plead Deception With Particularity ....................16

IV. CONNECTION'S PROMISSORY ESTOPPEL CLAIM FAILS AS A MATTER OF LAW (COUNT IV) ....................19

V. CONNECTION'S DECLARATORY JUDGMENT CLAIM IS ENTIRELY DERIVATIVE AND DUPLICATIVE (COUNT V) ....................20

CONCLUSION ....................20

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ahern v. Scholz*,
85 F.3d 774 (1st Cir. 1996) .......... 16

*Artuso v. Vertex Pharms., Inc.*,
637 F.3d 1 (1st Cir. 2011) .......... 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 7

*Bekele v. Lyft, Inc.*,
918 F.3d 181 (1st Cir. 2019) .......... 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 7

*Brooks v. AIG SunAmerica Life Assurance Co.*,
480 F.3d 579 (1st Cir. 2007) .......... 7

*Cheng v. Neumann*,
51 F.4th 438 (1st Cir. 2022) .......... 7

*City of Everett v. Barletta Eng'g Corp.*,
2005 WL 1683869 (Mass. Super. Ct. May 20, 2005) .......... 11

*Cochran v. Quest Software, Inc.*,
328 F.3d 1 (1st Cir. 2003) .......... 13

*Edlow v. RBW, LLC*,
688 F.3d 26 (1st Cir. 2012) .......... 8, 14

*Gen. Convention of New Jerusalem in the U.S., Inc. v. MacKenzie*,
874 N.E.2d 1084 (Mass. 2007) .......... 9

*Gishen v. Dura Corp.*,
285 N.E.2d 117 (Mass. 1972) .......... 11, 12, 13

*Given v. Com. Ins. Co.*,
796 N.E.2d 1275 (Mass. 2003) .......... 10

*Goldstein v. Enanta Pharms., Inc.*,
2011 WL 1795282 (Mass. App. Ct. May 12, 2011) .......... 16

*Graphic Arts Finishers, Inc. v. Bos. Redevelopment Auth.*,
255 N.E.2d 793 (Mass. 1970) ........................................................................................12

*Greene v. Ablon*,
794 F.3d 133 (1st Cir. 2015) ....................................................................................11, 12

*In re Fid. ERISA Fee Litig.*,
990 F.3d 50 (1st Cir. 2021) ........................................................................................2, 5

*In re Zofran (Ondansetron) Prods. Liab. Litig.*,
2017 WL 1458193 (D. Mass. Apr. 24, 2017) ..........................................................17, 18

*James B. Nutter & Co. v. Est. of Murphy*,
88 N.E.3d 1133 (Mass. 2018) ..........................................................................................9

*Kahalas v. Schiller*,
164 F. Supp. 3d 241 (D. Mass. 2016) ...........................................................................16

*Kobayashi v. Orion Ventures, Inc.*,
678 N.E.2d 180 (Mass. App. Ct. 1997) .........................................................................16

*Lanza v. FINRA*,
953 F.3d 159 (1st Cir. 2020) ..........................................................................................14

*Madan v. Royal Indem. Co.*,
532 N.E.2d 1214 (Mass. App. Ct. 1989) .......................................................................16

*Malden Police Patrolman's Ass'n v. City of Malden*,
82 N.E.3d 1055 (Mass. App. Ct. 2017) .........................................................................19

*Masingill v. EMC Corp.*,
870 N.E.2d 81 (Mass. 2007) ..........................................................................................20

*McCabe v. Ford Motor Co.*,
774 F. Supp. 3d 349 (D. Mass. 2025) ...........................................................................18

*McCartin v. Westlake*,
630 N.E.2d 283 (Mass. App. Ct. 1994) .........................................................................19

*Minassian v. Ogden Suffolk Downs, Inc.*,
509 N.E.2d 1190 (Mass. 1987) ......................................................................................10

*Mulder v. Kohl's Dep't Stores, Inc.*,
865 F.3d 17 (1st Cir. 2017) ............................................................................................17

*N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale*,
567 F.3d 8 (1st Cir. 2009) ..............................................................................................18

*Nat'l Fed'n of the Blind v. Container Store, Inc.*,
904 F.3d 70 (1st Cir. 2018) ....13, 14

*Nizhoni Health Sys. LLC v. Netsmart Techs., Inc.*,
2023 WL 3657386 (D. Mass. May 25, 2023) ....17

*Okerman v. VA Software Corp.*,
871 N.E.2d 1117 (Mass. App. Ct. 2007) ....11

*Okmyansky v. Herbalife Int'l of Am., Inc.*,
415 F.3d 154 (1st Cir. 2005) ....19

*Paquet v. Life Techs. Corp.*,
2019 WL 2156917 (Mass. App. Ct. May 17, 2019) (unpublished) ....10

*R.I. Hosp. Tr. Nat'l Bank v. Varadian*,
647 N.E.2d 1174 (Mass. 1995) ....20

*Robert E. Ricciardelli Carpet Serv., Inc. v. Home Depot U.S.A., Inc.*,
679 F. Supp. 2d 192 (D. Mass. 2010) ....15

*Rupprecht v. Rae*,
2013 WL 2445506 (Mass. Super. Ct. May 16, 2013) ....13

*Santos v. SANYO Mfg. Corp.*,
2013 WL 1868268 (D. Mass. May 3, 2013) ....17

*Shaulis v. Nordstrom, Inc.*,
865 F.3d 1 (1st Cir. 2017) ....14

*Sierra v. Bisignano*,
158 F.4th 43 (1st Cir. 2025) ....7

*Tomer v. Hollister Assocs., Inc.*,
70 Mass. App. Ct. 1104 (2007) (unpublished) ....15

*Trifiro v. N.Y. Life Ins. Co.*,
845 F.2d 30 (1st Cir. 1988) ....18

*Tyler v. Michaels Stores, Inc.*,
840 F. Supp. 2d 438 (D. Mass. 2012) ....20

*Valley Eye Physicians & Surgeons P.C. v. Modernizing Med. Billing Servs., LLC*,
2025 WL 2022021 (D. Mass. July 18, 2025) ....18

*Walsh v. TelTech Sys., Inc.*,
2015 WL 12856456 (D. Mass. July 30, 2015),
*aff'd*, 821 F.3d 155 (1st Cir. 2016) ....6, 16

*Whittier IPA, Inc. v. Steward Health Care Network, Inc.*,
2017 WL 1449763 (Mass. Super. Ct. Jan. 19, 2017) .......... 9

*Zurich Am. Ins. Co. v. Watts Regul. Co.*,
796 F. Supp. 2d 240 (D. Mass. 2011) .......... 16

## STATUTES

Mass. Gen. Laws Chapter 93A .......... 16, 18

## RULES

Fed. R. Civ. P. 9 .......... 16, 17, 18

Fed. R. Civ. P. 12 .......... 7

## TREATISES

Restatement (Second) of Contracts § 79 (1981) .......... 10

3 Williston on Contracts § 7:15 (4th ed.) .......... 10

## PRELIMINARY STATEMENT

Plaintiff Connection Model LLC's ("Connection") lawsuit fails because its contracts with Defendant HubSpot, Inc. ("HubSpot") foreclose any argument that it was entitled to a permanent stream of commissions. Although Connection claims that a series of written agreements (the "Agreements") with HubSpot established a "lifetime" commission for sales it made beginning in 2012, each version of the Agreement expressly permitted HubSpot to terminate for convenience on requisite notice and to stop paying commissions shortly thereafter. When a contract's terms make plain that either party can terminate without cause, a claim premised on a permanent contractual entitlement fails as a matter of law. The Agreements have also allowed HubSpot to modify their terms with notice to Connection since 2014, including Agreements on which Connection relies for its claims, further undermining Connection's core premise.

Connection participated in HubSpot's Partner Program for over a decade, accepting the Agreement and each subsequent modification thereto, and earning substantial commissions in the process. Connection did not file this lawsuit until three years after HubSpot exercised its express contractual right to adjust terms on a go-forward basis—a right Connection had accepted repeatedly for over a decade. At bottom, the Agreements and incorporated Program Policies foreclose Connection's claim that HubSpot breached a promise of "lifetime" commissions. HubSpot never made that promise, and it was never reasonable for Connection to expect permanence in the face of an at-will agreement that either party could terminate for convenience. Nor can Connection use equitable doctrines or statutory claims to manufacture obligations that the written contract expressly disclaimed. The Amended Complaint should be dismissed with prejudice.

The Amended Complaint's five counts fail as a matter of law. The breach of contract claim (Count I) founders on the express terms of the Agreements, which were always at-will, permitted

either side to terminate for convenience, made revenue sharing contingent on active customer engagement and other eligibility requirements, and reserved HubSpot's right to modify terms with notice. The implied covenant claim (Count II) impermissibly seeks to override the contractual provisions Connection voluntarily accepted. The Chapter 93A claim (Count III) fails because Connection does not allege any act that qualifies as unfair or deceptive under Massachusetts law. The promissory estoppel claim (Count IV) is barred by the governing written contract and, in any event, by the unreasonableness of any reliance on informal representations of "lifetime" commissions. Finally, the declaratory judgment claim (Count V) fails with the underlying claims.

## BACKGROUND

### A. The HubSpot Solutions Partner Program Agreement

Connection alleges that in or around 2012, Connection and HubSpot first entered into the Agreement, a "valid" contract that "appointed Connection as HubSpot's Partner for the sale of HubSpot's products and services." (Doc. No. 27 ¶¶ 2, 25, 120). Several provisions of the Agreement not referenced in the Amended Complaint are key to the Court's determination of whether Connection states a claim.[1]

#### 1. Termination Provisions

Each version of the Agreement allowed either party to terminate the Agreement without cause. The 2012 HubSpot Referral Partner Agreement provided that:

> Either party may terminate this Agreement on 60 days written notice to the other party .... Expiration or termination of this Agreement shall not affect HubSpot's obligation to pay Partner Referral Fees for referred customers of Partner, so long as the related payment by the customer is recognized by HubSpot within thirty (30) days after the date of such termination or expiration. ***HubSpot will not pay Partner Fees on customer payments recognized by HubSpot after that date***.

[1] The Agreements, attached as Exhibits 1 through 15 to this Motion, may be considered as incorporated by reference. *See In re Fid. ERISA Fee Litig.*, 990 F.3d 50, 53-54 (1st Cir. 2021).

Ex. 1 § 2(b)-(c) (emphasis added). The 2014 version provided substantially identical language:

> Both you and we may terminate this Agreement on sixty (60) days written notice to the other party .... Expiration of this Agreement, and termination of this Agreement without cause by us or by you with cause, shall not affect our obligation to pay you a Revenue Share, so long as the related payment by the End User is recognized by us within thirty (30) days after the date of such termination or expiration. We will not pay you fees on End User payments recognized by us after thirty (30) days after the date of such termination or expiration.

Ex. 2 § 10(b), (d).[2] Each subsequent Agreement has maintained the termination for convenience provision and the limited post-termination window for commissions owed thereafter, and no version obligated HubSpot to pay a Revenue Share beyond that limited post-termination period. *See* Ex. 3 § 11(b), (d); Exs. 4-5, 7-9 § 11(b), (e); Ex. 6 § 12(b), (f); Exs. 10-15 § 12(b), (e).

**2. Integration Clauses**

In 2014, the Agreement stated that it "will replace in its entirety any existing Partner Program Agreement we might have with you." Ex. 2. Beginning with the 2014 Agreement, every further version of the Agreement included an Entire Agreement clause, making clear that "[t]his Agreement is the entire agreement between us for [the] Program and supersedes all other proposals and agreements (including all prior versions of the … Agreement, if any), whether electronic, oral or written, between us." *Id.* § 15(i); *see* Exs. 3-5 § 16(i); Exs. 6, 10-15 § 17(j); Exs. 7-9 § 16(j).

**3. Modification Provisions**

Beginning in 2014, each version of the Agreement permitted HubSpot to modify the Agreement's terms with notice to Connection, and provided Connection the right to promptly terminate the contract if it disagreed with any such modification:

---

[2] From 2012 until 2017 and in 2019, the Agreement required sixty days' notice for termination without cause. Ex. 1 § 2(b); Ex. 2 § 10(b); Exs. 3-5, 7 § 11(b). In 2018, the Agreement required fifteen days' notice. Ex. 6 § 12(b). From 2020 to present, the Agreement has required thirty days' notice. Exs. 8-9 § 11(b); Exs. 10-15 § 12(b).

> We may update and change any part or all of this Agreement[, including by replacing it in its entirety]. If we update or change this Agreement, the updated Agreement will be posted at [the designated URL] and we will let you know [of the change through an in-app notification in your portal or by email]. ... We encourage you to review this Agreement periodically.

Ex. 2 § 15(a); Exs. 3-5, 7-9 § 16(a); Exs. 6, 10-15 § 17(a). Updates to the notification mechanism and the URL are the only changes to this provision from 2014 until present. For example, from 2014 to 2017, and in 2019, the Agreement stated:

> If you do not agree with a modification to this Agreement, [you] must notify us in writing within thirty (30) days ... If you give us this notice, this Agreement will terminate sixty (60) days after we receive this notice and our relationship will continue to be governed by the terms and conditions of the version of this Agreement applicable immediately prior to modification for the remainder of the Agreement term.

Ex. 2 § 15(a); Exs. 3-5, 7 § 16(a). In the 2018 and 2020 to present versions of the Agreement, the provisions read: "If you don't agree to the update or replacement, you can choose to terminate as we describe [in this Agreement]." Exs. 6, 8-15.

#### 4. Commission Provisions

Subject to the termination for convenience and modification provisions, the Agreements grant Connection a non-exclusive, non-transferable right to, among other things, demonstrate and promote HubSpot products and allow companies that contract with HubSpot ("End Users") to receive and access HubSpot's services. (Doc. No. 27 ¶¶ 22, 29). In return, HubSpot agreed to pay Connection a percentage of fees received from End Users who bought HubSpot's services through Connection ("Revenue Share"). (*Id.* ¶¶ 22, 37-39). For more than a decade before Connection filed suit, the exact contours of these commission payments were subject to partner- and transaction-specific eligibility and administrative requirements. Ex. 1 § 1(a); Exs. 2-3 §§ 1, 3(c), 4; Exs. 4-5, 7-9 §§ 1, 3(d), 4; Ex. 6 §§ 1, 4(d), 5; Exs. 10-15 §§ 1, 4(a), 5. For example, the 2014

Agreement provided that HubSpot would pay to partners 20% of fees paid to HubSpot by an End User subject to eligibility requirements, including that the partner remain "actively engaged with the End User." Ex. 2 §§ 1, 3(c).

**5. Program Policies**

The Agreements incorporate the "Program Policies" by reference. (Doc. No. 27 ¶¶ 31, 53); Ex. 2 § 15(l); Exs. 3-5 § 16(l); Exs. 6, 10-15 § 17(m); Exs. 7-9 § 16(m). As of 2020, Revenue Share payments could be discontinued if a partner "fail[ed] to meet any of the eligibility criteria ... as outlined in the Program Policies at any time." Exs. 8-9 § 3(d); Exs. 10-15 § 4(a). Connection also alleges that the HubSpot Solutions Partner Program Tiers and Benefits Guide ("Benefits Guide") is incorporated into the Agreement. (Doc. No. 27 ¶ 46).[3]

**B. The VAR Tier Program Brochure**

Connection also alleges that HubSpot published a Tier Program Brochure (the "Brochure"). (Doc. No. 27 ¶ 30). Connection does not attach the Brochure to the Amended Complaint or allege that the Brochure is part of the Agreement. None of the Agreements mention the Brochure. Connection does not allege when or how the Brochure was published or that it ever received or read the Brochure.

**C. HubSpot Modifies The Agreement Pursuant To Its Terms**

In April 2023, HubSpot modified the Agreement pursuant to the modification provisions. The change was announced in a "Program Update[]" in the 2023 Benefits Guide:

> Effective April 1, 2023 HubSpot solutions partners will earn 20% Revenue Share for three years on the value of the subscription for specific product lines sold on or after that date.... For qualified transactions closed prior to April 1, 2023, HubSpot will pay partners 20% commissions until April 1, 2025, regardless of whether the

---

[3] HubSpot attaches the 2020 and 2023 versions of the Benefits Guide as Exhibits 16 and 17 to this Motion. *See In re Fid. ERISA Fee Litig.*, 990 F.3d at 53-54.

> partner is managing the customer. Starting April 1, 2025, partners can continue to earn 20% commission on these legacy deals as long as they are receiving managed MRR [Monthly Recurring Revenue] credit for that customer.

Ex. 17 at 4. Starting in 2023, the incorporated Program Policies website explained that "Partner Revenue Share is equal to 20% of the monthly recurring net revenue and is paid for up to three (3) years. Existing partners who joined the program before February 21, 2023 and are being paid commissions will be subject to the legacy plan if they've closed a deal before April 1, 2023." Ex. 18 at 2. The linked "legacy plan" explained:

> Effective April 1, 2023, HubSpot changed the duration of the Revenue Share (commissions) term for new MRR from lifetime to three years/thirty-six (36) months for deals closed ***on or after*** April 1, 2023. For Qualified Transactions closed before April 1, 2023, partners ***will remain earning Revenue Share until April 1, 2025, regardless of whether or not they are managing the customer as long as the customer's subscription remains active. Partners can maintain Revenue Share after April 1, 2025,*** as long as the customer remains an active HubSpot subscription and the partner continues to manage that customer, as designated by managed MRR credit.

Ex. 19 at 1.[4] The legacy plan also stated that HubSpot's determination of partners' continued active management of customers was in its "sole discretion." *Id.* at 3. The Amended Complaint does not allege that Connection rejected the legacy plan or terminated its Agreement.

### D. HubSpot Revises Connection's Go-Forward Revenue Share Consistent With Previously Announced Modifications, And Connection Files This Lawsuit

As it announced in 2023, beginning with its August 2025 quarterly commission payments, HubSpot stopped paying commissions to Connection for transactions closed before April 1, 2023, if Connection failed to continue actively managing the End User. (Doc. No. 27 ¶¶ 8, 44, 63).

---

[4] The Court may take judicial notice of these archived versions of the Program Policies. *See Walsh v. TelTech Sys., Inc.*, 2015 WL 12856456, at *1 n.2 (D. Mass. July 30, 2015) (listing examples of courts taking judicial notice of archived webpages), *aff'd*, 821 F.3d 155, 160 (1st Cir. 2016).

Connection filed its Complaint on June 17, 2026. After HubSpot moved to dismiss (Doc. No. 22), Connection filed its Amended Class Action Complaint (Doc. No. 27).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). For purposes of a motion to dismiss, the Court may consider "documents the authenticity of which are not disputed by the parties," "documents central to plaintiffs' claim," and "documents sufficiently referred to in the complaint." *Sierra v. Bisignano*, 158 F.4th 43, 49 (1st Cir. 2025) (citation omitted). When materials incorporated into the complaint contradict allegations in the complaint, "the exhibit trumps the allegations." *Cheng v. Neumann*, 51 F.4th 438, 445 (1st Cir. 2022) (citation omitted).

## ARGUMENT

### I. CONNECTION'S BREACH OF CONTRACT CLAIM FAILS BASED ON THE AGREEMENTS' PLAIN TERMS (COUNT I)

The plain language of the Agreements makes clear that HubSpot never breached. A breach of contract claim under Massachusetts law requires a valid, binding contract, a breach of its terms, and resulting damages. *See Brooks v. AIG SunAmerica Life Assurance Co.*, 480 F.3d 579, 586 (1st Cir. 2007). HubSpot complied with the Agreements at all times because the contracts—which permitted termination for convenience and modification with notice, and called for commission payments to cease soon after termination—never promised unconditional, non-terminable, unmodifiable "lifetime" payments. Each successive agreement expressly superseded prior

agreements, and Connection accepted each new version of the Agreement, including the revised commission structure announced in 2023, by continuing to participate in the program and to accept commission payments and other benefits from it. Connection's alternative contention that the termination and modification provisions make the Agreements illusory is self-defeating, as it argues that no contract existed, foreclosing a claim for breach. Count I must be dismissed.

### A. The Express Contract Terms Preclude Any Expectation Of "Lifetime" Commissions

Under every version of the Agreement, HubSpot's obligation to pay commissions was expressly limited by a combination of termination provisions and active-engagement conditions; there was never a guarantee of unconditional, perpetual commissions. A party cannot claim breach based on obligations the counterparty did not agree to undertake. *See Edlow v. RBW, LLC*, 688 F.3d 26, 33 (1st Cir. 2012) (Massachusetts law) ("Where there is no obligation to provide under a contract, there can be no breach of that obligation."). Because the express language of the Agreements contradicts Connection's allegation that HubSpot agreed to provide unconditional, unmodifiable lifetime commissions, Connection's breach of contract claim fails.

From the outset, HubSpot's payment obligation was time limited. Every version of the Agreement made clear that HubSpot or Connection could terminate without cause on the requisite notice, limiting Connection to commissions on revenue recognized within at most thirty days thereafter. Ex. 1 § 2(c); Ex. 2 § 10(d); Ex. 3 § 11(d); Exs. 4-5, 7-9 § 11(e); Ex. 6 § 12(f); Exs. 10-15 § 12(e). The Agreement's terms, then, made Connection's alleged expectation of "permanent" or "lifetime" Revenue Share objectively unreasonable as a matter of law. If HubSpot could limit its commission obligations to fees collected within thirty days of its exercise of an unambiguous right to terminate the Agreement without cause, a lifetime right never existed.

The words matter, because courts assessing breach claims under Massachusetts law "must consider the meaning of the provisions that [plaintiff] claims were breached 'in the context of the entire contract'" and not in isolation. *Whittier IPA, Inc. v. Steward Health Care Network, Inc.*, 2017 WL 1449763, at *4 (Mass. Super. Ct. Jan. 19, 2017) (quoting *Gen. Convention of New Jerusalem in the U.S., Inc. v. MacKenzie*, 874 N.E.2d 1084, 1087 (Mass. 2007)). Here, even under an early version of the Agreement, Revenue Share was contingent on active engagement with the End User: "We might also determine that you are not eligible for a Revenue Share if you are no longer actively engaged with the End User.... We may discontinue Revenue Share payment should any of the eligibility criteria set forth in this subsection fail to be met at any time." Ex. 2 § 3(c). Revenue Share was thus never unconditionally "lifetime"—it was always plainly limited by the Program Policies and eligibility conditions. Connection's claim fails because it is premised on a plain "misreading of the Agreement," given that the contract conditioned payments and expressly limited post-termination payments to revenue recognized within thirty days thereafter. *See Artuso v. Vertex Pharms., Inc.*, 637 F.3d 1, 8 (1st Cir. 2011) (Massachusetts law).

Connection interprets the Agreements as granting it an inextinguishable, perpetual commission right, but that reading improperly reads the termination and active-engagement terms out of the contract. Massachusetts law precludes that result by requiring that a contract be interpreted "to give reasonable effect to each of its provisions." *James B. Nutter & Co. v. Est. of Murphy*, 88 N.E.3d 1133, 1139 (Mass. 2018) (citation omitted). It cannot be both that commissions were expressly limited to revenue recognized by HubSpot within thirty days after termination for convenience and that HubSpot was required to pay those commissions perpetually.

Connection's attempts to escape this conclusion by alleging that the terms render the Agreement "illusory" misstate Massachusetts law. Connection contends HubSpot's termination

and modification rights are unenforceable for lack of "mutuality of obligation" (Doc. No. 27 ¶ 81), but Massachusetts "has long ... abandoned the doctrine of 'mutuality of obligation'" in "accordance with the view expressed in standard treatises on contract law." *Given v. Com. Ins. Co.*, 796 N.E.2d 1275, 1278 n.4 (Mass. 2003). Pursuant to those treatises, "the obligations of parties to a contract need not be substantially equal." 3 Williston on Contracts § 7:15 (4th ed.); *see* Restatement (Second) of Contracts § 79 (1981) ("If the requirement of consideration is met, there is no additional requirement of … 'mutuality of obligation.'"). Accordingly, the fact that "one party to a contract has an option, not given to the other, to discontinue or extend performance or to cancel or renew the contract, or in some other manner to determine the extent of its performance" does not prevent the parties from being bound. 3 Williston on Contracts § 7:15.

Nor does the suggestion that the Agreement was offered on a "'take-it-or-leave-it' basis" (Doc. No. 27 ¶ 28) undermine the Agreement's enforceability here, because the contract governs a business-to-business relationship. In that context, contracts are enforceable "[w]hether or not one views [them] as contracts of adhesion." *Minassian v. Ogden Suffolk Downs, Inc.*, 509 N.E.2d 1190, 1192 (Mass. 1987). In *Minassian*, the Supreme Judicial Court enforced a contract presented on a "'take it or leave it' basis" by "the only thoroughbred race track in New England with a full-term [racing season]" to an individual racehorse owner who "had no choice but to sign [the contract] if he wished to race a horse" there, because "[i]n a business context such as this, there is far less reason to designate such agreements as unconscionable than in the typical consumer transaction." *Id.* at 1192 & n.2. Massachusetts courts thus often find purportedly adhesive contracts enforceable in the business context even where one party holds economic leverage over the other. *See, e.g.*, *Paquet v. Life Techs. Corp.*, 2019 WL 2156917, at *3 (Mass. App. Ct. May 17, 2019) (unpublished) (enforcing potentially adhesive contract "[i]n a business context" against

"highly-educated" individual plaintiff); *City of Everett v. Barletta Eng'g Corp.*, 2005 WL 1683869, at *3 (Mass. Super. Ct. May 20, 2005) (enforcing "arguabl[e] contracts of adhesion in the business context"). Connection plainly agreed to the Agreements in a business context (*see* Doc. No. 27 ¶¶ 20-24 (describing "Connection's Business Model")), and touts "at least 17 years of experience" assisting companies of all sizes across industries (*id.* ¶¶ 20-21). As a result, it cannot invoke individual consumer standards to try to avoid the terms of its Agreement with HubSpot.

**B. Connection Accepted Modifications Through Continued Participation**

Connection's breach of contract claim also fails because HubSpot permissibly modified the Agreement's commission structure to require active management of End Users as a condition of receiving further commissions. A contractual modification is enforceable where there is "mutual assent and consideration." *Okerman v. VA Software Corp.*, 871 N.E.2d 1117, 1125 (Mass. App. Ct. 2007) (citing *Gishen v. Dura Corp.*, 285 N.E.2d 117, 121 (Mass. 1972)). Under the Agreements' terms, Connection assented to modification by failing to object or terminate the contract. Connection received consideration for the modifications in the form of its continued participation in the Program and ability to make new sales and reap commissions therefrom. Accordingly, the 2023 modification was enforceable, and any alleged prior right to perpetual commissions was properly modified.

*First*, Connection assented to the modification. "Assent may be inferred from conduct," *Greene v. Ablon*, 794 F.3d 133, 147 (1st Cir. 2015) (Massachusetts law) (citation omitted), including continuing to operate under a contract post-modification where the contract defines continued operation as assent, *see, e.g.*, *Bekele v. Lyft, Inc.*, 918 F.3d 181, 184, 190 (1st Cir. 2019) (Massachusetts law) (finding assent to modification where contract stated: "If We post amended terms on the Lyft platform, You may not use the Services without accepting them"). HubSpot

reserved the express right to modify the contract at least since 2014, and Connection could either object and terminate within the defined period or assent to the change. *See, e.g.*, Ex. 2 § 15(a). Connection does not plead that it ever rejected a modification. Accordingly, Connection cannot plausibly allege that it withheld consent to any modification, including changes to the commission structure. *Cf. Gishen*, 285 N.E.2d at 121 ("[A]s [a] matter of law, there were both consideration and assent for the February modification in [the plaintiff's] continuing to work for [the defendant], with its knowledge and approval, at considerably lower commission rates.").

The Amended Complaint also refutes any argument that Connection never agreed to the versions of the Agreement that had the modification provision. Connection seeks to enforce its alleged "revenue share rights" based on "[t]he Agreement defin[ing] Partner's 'Revenue Share' as 'an amount equal to twenty percent (20%) of Net Revenue.'" (Doc. No. 27 ¶¶ 9, 38). But the term "Revenue Share" is absent from the 2012 version of the Agreement; it first appears in the 2014 version, which contained a modification provision. *Compare* Ex. 1, *with* Ex. 2. Connection also quotes language that appeared for the first time in the 2020 version of the Agreement in which HubSpot combined its "Partner" and "Provider" programs. (Doc. No. 27 ¶ 25 (quoting Agreement as stating "a contract between you (the Partner or Provider, together addressed as Participant(s)) and us (HubSpot)")). *Compare* Exs. 1, 7, *with* Ex. 8. Rather than alleging that it took issue with or lacked awareness of HubSpot's exercise of its right to modify the contract by posting new terms and Program Policies, Connection embraces those modifications as part of the contract it seeks to enforce, further "conduct" from which its "[a]ssent may be inferred." *Greene*, 794 F.3d at 147.

*Second*, Connection's continued receipt of commissions consistent with the go-forward terms supplied the consideration necessary to support each modification. Consideration to support a modification "is enough if it is valuable." *Graphic Arts Finishers, Inc. v. Bos. Redevelopment*

*Auth.*, 255 N.E.2d 793, 796 (Mass. 1970). Had Connection not agreed to the modifications, it would not have received commissions for post-2023 sales of HubSpot's products and services. Connection guaranteed its ability to refer new End Users and earn commissions under the then-applicable contract on new transactions by remaining in the Program rather than terminating the Agreement. (*See* Doc. No. 27 ¶ 44 (noting that HubSpot continues to pay some commissions to Connection)). That is sufficient consideration to make the modification enforceable. *See Gishen*, 285 N.E.2d at 121 (holding that continuing to work and receive payment at lower modified commission rates constitutes consideration for contract modifications); *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 10 (1st Cir. 2003) (Massachusetts law) (continued performance after contract modification where "employee had no right to continued employment and the employer had no right to the employee's future services" satisfies consideration requirement).

### C. Connection's Illusoriness Contention Is Incorrect And Self-Defeating

If Connection were correct that the termination and modification provisions made the Agreements "illusory" (Doc. No. 27 ¶¶ 67, 81), then Connection's claim would fail for another reason: Connection cannot sue for breach of an illusory contract. "[A] contract that is illusory was never formed, because it lacked the necessary consideration—in other words, there was never a bargained-for exchange." *Nat'l Fed'n of the Blind v. Container Store, Inc.*, 904 F.3d 70, 86 (1st Cir. 2018). And, if there is "no contract" because nothing was done "in exchange for consideration," then "there was no breach." *Rupprecht v. Rae*, 2013 WL 2445506, at *3 (Mass. Super. Ct. May 16, 2013).

Connection's theory that the termination and modification provisions should simply be severed from the payment provisions it seeks to enforce ignores the fact that illusoriness is a formation problem: because Connection's argument would negate the existence of a contract as a whole, there would be no provisions to be severed. In *Container Store*, the First Circuit rejected

a request to sever "any illusory provision of the contract" despite the existence of a severability clause because doing so would require the court "to engage in an absurd process" of "reviving a contract [it] found was never formed for its lack of consideration." 904 F.3d at 87-88 & n.22.[5] HubSpot's position is that the termination and modification provisions are binding, but even an adverse finding would prevent a conclusion that those provisions could be severed.

## II. CONNECTION CANNOT CONVERT HUBSPOT'S EXERCISE OF CONTRACTUAL RIGHTS INTO AN IMPLIED COVENANT CLAIM (COUNT II)

Connection's claim for breach of the implied covenant of good faith and fair dealing (Count II) fails because the implied covenant cannot override or contradict express contract terms. Under Massachusetts law, "the implied covenant of good faith and fair dealing 'does not create rights or duties beyond those the parties agreed to when they entered into the contract.'" *Lanza v. FINRA*, 953 F.3d 159, 164 (1st Cir. 2020) (citation omitted). Nor can a party "weaponize the implied covenant in a manner that contradicts the plain terms of a contract." *Id.* Where an action "was expressly permitted by the agreement," an implied covenant claim fails absent "a plausible allegation of bad faith." *Edlow*, 688 F.3d at 36 (citation omitted). Connection's attempt to recast HubSpot's lawful exercise of its contractual rights as "bad faith" fails as a matter of law.

*First*, Connection had no vested right to perpetual commissions under an Agreement that expressly reserved the right to modify terms and terminate at will. The implied covenant cannot be invoked to override contractual rights that Connection agreed to in an Agreement from which it benefited. *See Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 n.7 (1st Cir. 2017) (Massachusetts law) ("[T]he implied covenant may not be invoked to create rights and duties not contemplated by

---

[5] Unlike the provisions at issue in this case, the modification provision in *Container Store* expressly did not require notice. 904 F.3d at 87. Moreover, although the First Circuit applied Texas law, it noted that "the principles governing our decision are so fundamental and basic, the outcome does not change whether we apply Massachusetts or Texas law." *Id.* at 80 n.13.

the provisions of the contract or the contractual relationship." (citation omitted)). Nor can there be a "claim for a breach of the covenant based on a party's exercise of its explicitly conferred contractual rights." *Robert E. Ricciardelli Carpet Serv., Inc. v. Home Depot U.S.A., Inc.*, 679 F. Supp. 2d 192, 207 (D. Mass. 2010) (citation omitted). What Connection characterizes as "curtail[ment]" and "recapture" was simply HubSpot's exercise of its contractual right to modify compensation terms—a right that Connection accepted when it entered and continued to participate in the Program. *See supra* Section I.B.

*Second*, the Agreement's structure, which allowed partners to terminate if they disagreed with modifications, was disclosed from the outset, and Connection could have terminated the Agreement rather than accept modified terms. Connection does not allege that the then-operative terms of the Agreement were hidden from it. Connection's arguments that HubSpot "unilateral[ly] demand[ed] ... additional performance in the form of active account management" in an attempt "to completely restructure the nature of the agreement" (Doc. No. 27 ¶ 136) are unavailing. Active-engagement provisions have been included in versions of the Agreements as far back as 2014, *see supra* Section I.A, and the Agreement's modification provisions expressly permitted HubSpot to amend program terms. *See supra* Section I.B. The mere assertion that a party "had no choice" but to accept the modification does not alter this analysis. *Cf. Tomer v. Hollister Assocs., Inc.*, 70 Mass. App. Ct. 1104, at *3-4 (2007) (unpublished) ("[I]n continuing to work for [the defendant] after his salary was reduced, [the employee] assented to and received adequate consideration for the modifications," even where the employee had "voiced his objection").

## III. CONNECTION HAS NOT PLEADED A CHAPTER 93A CLAIM (COUNT III)

Connection's Chapter 93A claim (Count III) fails because the alleged conduct is neither unfair nor deceptive—it reflects the ordinary conduct of commercial relationships between sophisticated contractual counterparties. That is not enough under Chapter 93A, because "[a]

plaintiff seeking relief under Chapter 93A must prove that the defendant engaged in 'unfair or deceptive acts or practices in the conduct of any trade or commerce.'" *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016) (quoting Mass. Gen. Laws ch. 93A, § 2). "A corporate plaintiff faces 'a stricter standard than consumers in terms of what constitutes unfair or deceptive conduct.'" *Kahalas v. Schiller*, 164 F. Supp. 3d 241, 248 (D. Mass. 2016) (citation omitted).

**A. Connection Does Not Allege Unfair Conduct**

Connection does not allege any unfair acts or practices. "[T]he mere breach of a contract, without more, does not amount to a [Chapter] 93A violation." *Zurich Am. Ins. Co. v. Watts Regul. Co.*, 796 F. Supp. 2d 240, 244 (D. Mass. 2011) (second alteration in original) (quoting *Madan v. Royal Indem. Co.*, 532 N.E.2d 1214, 1217 (Mass. App. Ct. 1989)). Rather, "the breach must be 'so egregious as to possess an extortionate quality that gives it the rancid flavor of unfairness.'" *Id.* (quoting *Goldstein v. Enanta Pharms., Inc.*, 2011 WL 1795282, at *1 (Mass. App. Ct. May 12, 2011)). Connection's Chapter 93A claim is predicated on conduct surrounding HubSpot's alleged breach of the Agreement's commission structure—conduct that, even if proven, would not satisfy this exacting standard. *See Ahern v. Scholz*, 85 F.3d 774, 799 (1st Cir. 1996) (even a knowing breach "in order to gain a benefit—[the plaintiff's] share of the royalties" did not rise to the level of a Chapter 93A violation because that "would be true of any knowing breach of a contract"). Because this case "involve[s] 'an ordinary contract dispute' between sophisticated commercial players," the Chapter 93A claim must be dismissed. *Zurich*, 796 F. Supp. 2d at 245 (quoting *Kobayashi v. Orion Ventures, Inc.*, 678 N.E.2d 180, 189 (Mass. App. Ct. 1997)) (dismissing Chapter 93A counterclaim).

**B. Connection Does Not Plead Deception With Particularity**

Connection does not plead deceptive conduct with the particularity that Rule 9(b) requires. Where a Chapter 93A claim rests on "alleged misrepresentation and concealment," the claim is

subject to Rule 9(b)'s heightened pleading standard and must be pleaded "with particularity." *Santos v. SANYO Mfg. Corp.*, 2013 WL 1868268, at *6 (D. Mass. May 3, 2013); *see also Mulder v. Kohl's Dep't Stores, Inc.*, 865 F.3d 17, 21-22 (1st Cir. 2017) ("Rule 9(b)'s requirements apply … 'where the core allegations effectively charge fraud.'" (citation omitted)). Connection's allegations of deception—that through statements in the Brochure and by then-CEO Brian Halligan about the status of commissions HubSpot "simultaneously marketed lifetime commissions … while internally planning to eliminate them" (Doc. No. 27 ¶¶ 6, 41, 67, 70; *see also id.* ¶ 145(a))—fail to plead deception in three independent respects.

*First*, the Amended Complaint does not sufficiently identify the circumstances of any alleged misrepresentation. To satisfy Rule 9(b), a plaintiff must set forth "the who, what, where, and when of the allegedly false or fraudulent representation." *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 2017 WL 1458193, at *4 (D. Mass. Apr. 24, 2017) (citation omitted). Vague temporal statements do "not provide the particularity Rule 9(b) requires." *Nizhoni Health Sys. LLC v. Netsmart Techs., Inc.*, 2023 WL 3657386, at *8 (D. Mass. May 25, 2023) (finding allegations that misrepresentations "were made '[d]uring the 2019 negotiations'" inadequate to satisfy the "when" under Rule 9(b) (alteration in original)). Connection points to three extracontractual sources of the alleged "lifetime" promise—the Brochure, an "all-partners live presentation" by Halligan, and a campaign in which the lifetime feature was "heavily promoted to Connection and its peer group"—but pleads specifics for none. (Doc. No. 27 ¶¶ 30, 41, 50, 153). Connection does not allege when the Brochure was published or distributed or what statement in it was false; indeed, Connection does not even allege that the Brochure promised commissions for the "lifetime" of any customer, only that it "emphasizes that Partners will receive a 20% revenue share." (*Id.* ¶ 41). Connection likewise fails to include any detail on where or when Halligan's presentation occurred.

As for the "broad allegations of statements made in a nationwide marketing campaign," those are "insufficient to pass muster under Rule 9(b)" without "specific allegation[s]" as to the allegedly deceptive campaign elements, *In re Zofran*, 2017 WL 1458193, at *6—Connection does not allege what those statements were, when they were "widely publicized," or in what context. (Doc. No. 27 ¶¶ 41, 153). These allegations—untethered to any time or place—should be disregarded.

*Second*, Connection fails to adequately plead scienter. A Chapter 93A claim based on deception requires the plaintiff to plead scienter by "identifying the basis for inferring" it, including "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009) (citation omitted); *see Valley Eye Physicians & Surgeons P.C. v. Modernizing Med. Billing Servs., LLC*, 2025 WL 2022021, at *5-6 (D. Mass. July 18, 2025) (dismissing Chapter 93A claim for failure to plead scienter). "[C]ourts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity." *Cardinale*, 567 F.3d at 13 (citations omitted). Here, Connection does nothing more than generally aver that HubSpot marketed lifetime commissions "while internally planning to eliminate them" and had "knowingly false pretenses," without pleading any facts supporting the existence of any such internal plan. (Doc. No. 27 ¶¶ 6, 70). That is insufficient to plead deception. *See Valley Eye*, 2025 WL 2022021, at *3 (holding allegation defendant "knowingly misrepresented" to "induce" action insufficient without supporting facts).

*Third*, Connection fails to plead reasonable reliance on any allegedly deceptive conduct. In the context of alleged deception, "a violation of Mass. G.L. c. 93A require[s] reasonable reliance." *Trifiro v. N.Y. Life Ins. Co.*, 845 F.2d 30, 33 (1st Cir. 1988). Under Rule 9(b), "[r]eliance … must be pleaded with particularity." *McCabe v. Ford Motor Co.*, 774 F. Supp. 3d

349, 387 (D. Mass. 2025) (citation omitted). Connection does not allege with particularity any reliance on the Brochure or Halligan's statements—it does not allege it ever received or read the Brochure or attended or heard Halligan's presentation, much less that it specifically relied on either. (Doc. No. 27 ¶¶ 30, 41). Moreover, any reliance would not have been reasonable. As set forth above, the Agreements unambiguously reserved HubSpot's right to modify the commission structure and to terminate the relationship. *See supra* Section I. Connection, a fellow commercial entity with "at least 17 years of experience" (Doc. No. 27 ¶ 20), cannot claim to have been deceived by marketing materials when the governing contract was clear. *See McCartin v. Westlake*, 630 N.E.2d 283, 290 (Mass. App. Ct. 1994) (reversing Chapter 93A judgment where alleged misrepresentations were contradicted by the parties' written agreement).

## IV. CONNECTION'S PROMISSORY ESTOPPEL CLAIM FAILS AS A MATTER OF LAW (COUNT IV)

Connection's promissory estoppel claim (Count IV) fails for two independent reasons. *First*, the equitable doctrine of promissory estoppel does not apply where, as here, an enforceable contract governs the parties' relationship, regardless of whether the contract was breached. *Second*, reliance on any alleged promise of lifetime commissions was unreasonable as a matter of law. Either deficiency independently warrants dismissal.

*First*, it is black-letter Massachusetts law that "[w]here an enforceable contract exists ... a claim for promissory estoppel will not lie." *Malden Police Patrolman's Ass'n v. City of Malden*, 82 N.E.3d 1055, 1064 (Mass. App. Ct. 2017). Connection itself alleges that "a valid and enforceable contract governs the parties' relationship" (Doc. No. 27 ¶ 150), making a claim for promissory estoppel unavailable as a matter of law. *See Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 162 (1st Cir. 2005) (Massachusetts law) (holding that conceded existence of "valid express contract" "bar[red] the application of the equitable doctrines" that plaintiff invoked).

Connection's allegations that HubSpot made any oral or informal communications in the face of a written contract cannot represent a "promise" or "commitment" for promissory estoppel purposes because the existence of a written contract demonstrates the parties' intention that it would govern their intricate transaction. *R.I. Hosp. Tr. Nat'l Bank v. Varadian*, 647 N.E.2d 1174, 1179 (Mass. 1995).

*Second*, and in any event, Connection did not plead reasonable reliance. *See supra* Section III.B. And even if it had, "[i]t is unreasonable as a matter of law to rely on prior oral representations that are (as a matter of fact) specifically contradicted by the terms of a written contract." *Masingill v. EMC Corp.*, 870 N.E.2d 81, 89 (Mass. 2007). As discussed in Sections I and III, *supra*, the Agreement's express modification provisions, termination rights, and eligibility and active-engagement conditions demonstrate that any belief in immutable "lifetime" commissions was objectively unreasonable.

## V. CONNECTION'S DECLARATORY JUDGMENT CLAIM IS ENTIRELY DERIVATIVE AND DUPLICATIVE (COUNT V)

Connection's declaratory judgment claim (Count V) fails with the underlying claims. "The Declaratory Judgment Act is not an independent grant of federal jurisdiction ... so dismissal of the underlying claims requires dismissal of the claim for declaratory relief as well." *Tyler v. Michaels Stores, Inc.*, 840 F. Supp. 2d 438, 452 (D. Mass. 2012) (citations omitted). Because Counts I-IV fail for the reasons stated above, Count V must be dismissed.

## CONCLUSION

For the foregoing reasons, HubSpot respectfully requests that the Court grant this Motion to Dismiss and dismiss the Amended Complaint with prejudice, as Connection has already amended its complaint once and further amendment would be futile.

Dated: October 26, 2026

Respectfully submitted,

/s/ Nathan A. Sandals

Nathan A. Sandals (BBO # 696032)
Zachary R. Edelman (BBO # 718211)
Sophie C.E. d'Orchimont (BBO # 716833)
**LATHAM & WATKINS LLP**
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
nathan.sandals@lw.com
zach.edelman@lw.com
sophie.dorchimont@lw.com

*Attorneys for Defendant HubSpot, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent on October 26, 2026, to those identified as non-registered participants.

/s/ Nathan A. Sandals
Nathan A. Sandals